# TIMOTHY RYAN *vs.* CANTON NATIONAL BANK.

*Limitations—When Payment is an Acknowledgment of the Existence of a Larger Indebtedness—Failure to Reply to Letter—Construction of Agreement.*

The bar of the Statute of Limitations against a claim is not removed by the acknowledgment arising from a part payment unless the payment be expressly made as in partial discharge of a larger sum then due so as to constitute an admission of the existence of the larger debt.

The fact that a party to whom a check for a sum of money is sent writes a letter to which no reply is made, stating that he receives the same in part payment of his claim is not evidence to show that the payment made by the check was intended by the party making it as only a part payment and an admission of the existence of a larger indebtedness.

Plaintiff was employed by a bank to conduct a certain business for it and retained the sum of $100 monthly for his services, and during their rendition claimed no larger compensation. The directors of the bank understood that plaintiff had agreed to do the work for that sum. The business so conducted by the plaintiff was sold to third parties, and ·plaintiff turned over all the proceeds to the bank. He expressed dissatisfaction with the amount received by him and the bank paid him $1,000 additional in pursuance of a resolution expressing the same to be for his services. Plaintiff wrote a letter acknowledging its receipt as a part payment for his services. More than three years after the sale of the business plaintiff brought this action to recover additional compensation for his services. *Held*, that the Statute of Limitations is a bar to the claim and that the payment of $1,000 by the bank under these circumstances was a gratuity and not such an acknowledgment of an existing indebtedness as removed the bar of the Statute of Limitations.

Plaintiff was carrying on a business in his name but for the benefit of a bank, which supplied him with funds by discounting his notes endorsed by his brother. The bank executed an agreement by which it agreed to hold safe and harmless and to fully protect these parties on account of the making of the notes and to protect them from any liability by reason of the conduct of the business. After the business was closed out plaintiff claimed to be entitled to larger compensation than he had received during its continuance. The defendant bank pleaded limitations. *Held*, that the above-mentioned agreement has no relation to the amount of compensation plaintiff was entitled to receive for his services under his contract with the bank.

Appeal from the Superior Court of Baltimore City (PHELPS, J.)

The cause was argued before McSHERRY, C. J., BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Thomas G. Hayes*, for the appellant.

1. The defense to limitations made by the appellant is first part payment on the debt in suit made within three years before suit was brought. Partial payment on a subsisting debt in law is recognized as a bar to the running of the Statute of Limitations. It is said by some of the authorities to be the very best bar to the statute. 19 *A. & E. Ency. Law*, 323; *Wood on Lim.*, sec. 96, note 1, p. 24; *Buswell on Lim.*, sec. 77; *Miner* v. *Lorman*, 56 Mich. 212; 22 N. W. 265; *Blaskower* v. *Steel*, 23 Or. 106; 31 Pac. 253; *Day* v. *Mayo*, 154 Mass. 472; 28 N. E. 898; *Sinnett* v. *Sinnett* (Me.) 19 Atl. 458; *Wilmer* v. *Gaither*, 68 Md. 345; *Summer* v. *Young*, 10 Md. 247; *Burgoon* v. *Bixler*, 55 Md. 392.

2. It is conceded that the law requires the debt to be known to the debtor on which the part payment is made, in order to make the part payment effective as a bar to the running of the Statute of Limitations. *Beltzhoover* v. *Yewell*, 11 G. & J. 212.

When the debtor is a corporation the only knowledge or notice of the debt on which the part payment is made which the corporation can be given is constructive knowledge or notice. That is to say actual knowledge or notice to the proper officer of such corporation, officially or within the scope of his duties or employment, of such debt on which the part payment is claimed to be made is all the law requires. 10 *Cyc.* 1054; *Harris* v. *Bldg. & L. Ass.* (Ala.) 25 So. Rep. 202; *Black* v. *Bank of Westminster*, 96 Md. 423; *Md. Trust Co.* v. *Mechauics Bank*, 102 Md. 608. In the case at bar the plaintiff testifies as to the knowledge the directors, who were in charge of the business, had of his debt, "I told them repeatedly."

3. With this constructive knowledge had by the appellee of the debt due the appellant, the former pays the appellant $1,000 "for his services" and the appellant receipted for it as

"part payment" on account of the debt sued on. This was evidence legally sufficient to warrant the jury in inferring both an acknowledgment and promise to pay the balance of the debt and should have been submitted to them for their consideration and determination. *Wood on Lim.*, sec. 96, note, p. 246; *Buswell on Lim.*, sec. 77; *White* v. *Jordan*, 27 Me. 37; *Wainman* v. *Kyman*, 8 Ex. 116; *Ayer* v. *Hawkins*, 19 Vt. 29; *Parsons* v. *Clark*, 59 Mich. 414; 26 N. W. 659; *Engman* v. *Est. of Immel*, 59 Wis. 249; 18 N. W. 185; *Christian* v. *State*, 7 Ind. App. 417; 34 N. E. 827; *Beltzhoover* v. *Yewell*, 11 G. & J. 214.

4. When the debtor knows of the debt either constructively or actually and makes an unqualified part payment on that debt and nothing was said by the parties as to the object or purpose of the payment, the law creates a presumption that the intention of the debtor was to renew the obligation.

"When the creditor has established the fact of partial payment it will be presumed that it was unaccompanied by any fact or circumstance which would tend to qualify its effect upon the running of the statute, and it is incumbent upon the debtor to show that it was made under such circumstances as to repel the presumption." 8 *Encyc. Ev.*, 321. The same principle of law has been stated by the Supreme Court of Michigan in speaking of part payments as a bar to the Statute of Limitations, "The trial Judge was bound to presume, and this Court must presume, that these payments were unaccompanied by any facts or circumstances which would tend to qualify their presumed effect." *Neilands* v. *Wright*, 134 Mich. 77. The Supreme Court of North Carolina has thus said the same thing, "If the payments were made and nothing else appearing, the law presumed the intention, and it was not necessary for the plaintiff to prove what the law presumed from the fact of payment." *Young* v. *Alford*, 118 N. C. 218; 23 S. E. 973. In the case at bar the plaintiff proved the debt due, constructive knowledge by the appellee of the debt and part payment on that debt of $1,000. These facts made a *prima facie* case, with the above presumption of law, which entitled

the appellant to go to jury on the issue of limitations, notwith-
standing what the appellee might show in reply. *Strasberger*
v. *Vogel*, 103 Md. 85.

5. The effort of the appellee to qualify the part payment
which at the time of making it was unqualified by subsequent
expressed opinions of certain directors, not made at the time
of part payment that the payment of $1,000 to appellant was
a gratuity and made to satisfy the appellant who was dissatis-
fied with his $100 per month, is in the teeth of the universally
accepted rule of law that such subsequent statements are never
admissible to show the intention of the debtor in making the
part payment, when such intention was not expressed when
the part payment was made by the debtor. "But if the pay-
ment is unqualified at the time when it was made, the debtor
cannot thereafter destroy the effect of the statute by adding
qualifications." 19 *A. & E. Ency. Law*, 326; *Marshall* v.
*Holmes*, 68 Wis. 559; 32 N. W. 685.

The admissible proof of the appellee offered to meet this
*prima facie* case of the appellant, but strengthened such *prima
facie* case by showing an entry on its minutes which declared
the $1,000 was paid appellant "for his services." The sub-
sequent opinions of certain directors that the payment was a
gratuity is not borne out by the entry on minutes.

6. The excluding from the jury of the receipt given by ap-
pellant in due course of mail on receipt of check for the
$1,000, in which it was stated that the $1,000 was accepted
by appellant in "part payment" on the debt sued on, was pal-
pable error. The receipt was legal evidence on the issue of
limitations for the following reasons: 1. It was relevant and
material evidence on the issue of limitations as made by the
pleadings. 2. It was admissible as a part of the *res gestae* of
the payment and acceptance of the $1,000. *Robinson* v. *State*,
57 Md. 14; 16 *Cyc.*, 1158; *Waters* v. *Thompson*, 5 L. J. (N.
S.) Ex. 61; 41 R. R. 827; *Wright* v. *Tatham*, 4 Bing. (N.
C.) 489; 3 *Wigmore Ev.*, sec. 5177, p. 2286; 24 *A. & E.
Ency. Law*, 674; *Hood* v. *French*, 37 Fla. 117; 19 So. 165;
*Barber* v. *Bennett*, 58 Vt. 476, 4 Atl. 236; *Bank* v. *Kennedy*,

1 Wall. 637; *Brooks* v. *Daggon*, 149 Mass. 306; *Quynn* v. *Carroll*, 10 Md. 197.   3.   The creditor had the right to apply the payment, the debtor not having made the applications.   *Donally* v. *Wilson* (Va.) 5 Leigh, 329; 2 *A. & E. Ency. Law*, 434, note 2; *McDonnell* v. *Bank*, 20 Ala. 318; *Dickey* v. *Per. Land Co.*, 63 Md. 176; *Blake* v. *Sawyer*, 83 Me. 129; 12 L. R. A. 712.   4.   The appellee after receiving the receipt acquiesced in the statement made in it and kept it without a word of objection or protest until the trial of this case.  1 *A. & E. Ency. Law*, 570; *Harris* v. *Bldg. & L. Ass.* 122 Ala. 554; 25 So. 200; 16 *Cyc.*, 681, 692; *Linley* v. *Bonsor*, 2 Scott, 399.  It was a proper notice of the creditor to the debtor of the former's receipt of the $1,000 and its application. 6.  The receipt was put in evidence as a part of the appellee's testimony and clearly the bank had no right to have it stricken out or withheld from the jury after it had thus been put in evidence as a part of its case.   *Atwell* v. *Grant*, 11 Md. 106.

7.  Independent of part payment, the suit was brought within three years of the accrual of the cause of action.   Under the employment of appellant no time was fixed for the payment for his services, and under the law his right to demand payment for his services or bring suit did not accrue until his services ended.   The appellant's service in connection with the business of Kirwan & Tyler did not end until March 27th, 1902, which was only two years and four months before suit brought.   19 *A. & E. Ency. Law*, 193; *Wood on Lim.*, secs. 120, 304; *Little* v. *Snively*, 9 Ind. 106; *Schoch* v. *Gadette*, 67 Pa. St. 152.

8.  The part payment of $1,000 was made by the directors of the appellee to the appellant when demand was made on the directors for "remuneration" to the appellant for the services he had rendered the appellee in conducting the business of Kirwan & Tyler.   The facts in the record furnish every legal requisite to make the part payment effective as a bar to the Statute of Limitations.   1. The debt due from appellee to appellant.   2.  Constructive knowledge or notice of this debt by the appellee.   3.  Demand made on the appellee for "re-

muneration" for the services rendered by the appellant.   4.
In response to this demand payment of $1,000 "for services."
What more could possibly be required?   These facts show a
greater debt was admitted at the time of the part payment,
because the appellee had constructive knowledge or notice of
this greater debt, and the balance of this debt is not repudia-
ted when the $1,000 is paid.   If A demands of B the pay-
ment of a debt for services, amounting to $7,000, and in reply
to this demand B pays unqualifiedly $1,000, can there be any
doubt that B by the payment of the $1,000 admits the exist-
ence of the greater debt and bars the statute on the balance of
the debt?   This would unquestionably be an admission by the
debtor of a still existing debt.

*S. S. Field* (with whom was *Daniel L. Brinton* on the brief),
for the appellee.

The theory upon which the plaintiff based his claim to a
salary of $358.33 ⅓ per month was that the bank through Hor-
ner, *one* of the *three* directors of the defendant, who composed
the committee in charge of the Kirwan & Tyler matter; made
an express contract with him to pay him for his services *what
would satisfy him*, and he finally determined four or five months
after his employment had ceased, that it would take $358.33 ⅓
per month to satisfy him.   This express contract the plaintiff
makes out of the following remark made by Horner in the
presence of plaintiff, his brother, Messrs. Brinton, Kirwan &
Tyler.   According to the plaintiff Mr. Horner said: "I wish you
success, he says, the business, when the Ryan boys are satis-
fied, we will turn the business over to Messrs. Kirwan & Ty-
ler."

The Court ruled that this was not legally sufficient to prove
a contract by the bank to pay the plaintiff what would satisfy
him for his services; which ruling may be justified on two
grounds: (1) Because Horner's remark, under the circum-
stances, cannot be made to mean a contract to pay Ryan for
his services what would satisfy him; and (2) Because Horner,
a single member of the defendant's committee, had no power

to bind the defendant, by an alleged agreement which was never authorized or ratified by the other members of the committee or by the defendant's directors.

It seems to us that *no* rational mind *could in fairness* interpret this remark to mean a contract between the bank and Ryan to pay him what would satisfy him for his services; and therefore a jury would not be permitted to put that interpretation on it. *Baltimore · Elevator Co.* v. *Neal,* 65 Md. 438, 459; *Knell* v. *Briscoe,* 49 Md. 414, 422.

Nor could any principle of ratification or estoppel be applied against the bank from accepting plaintiff's services, because they accepted his services in the belief that they were being rendered for $100 per month, which amount Ryan was paying himself out of the funds of the business month by month. This was the contract Furst was authorized to make with Ryan, the contract he reported to them he had made, and the only contract they ever heard of. *Lyndon Co.* v. *Lyndon,* 63 Vt. 581, 585–6; *Hawkins* v. *U. S.,* 96 U. S. 697–8.

Every monthly statement of the affairs of the business which the *plaintiff* rendered to the directors; each of which showed himself paid $100 per month, and did *not show* any indebtedness to him; was a statement *by the plaintiff* that he was employed by the defendant at $100 per month.

According to the plaintiff's own testimony, not only that the bank did not know that they owed him anything, but also that the bank *never knew until be brought suit that he claimed* it owed him anything.

This would seem to be an end of any contention that the defendant *acknowledged* an indebtedness, for it is impossible for one to *acknowledge* anything of which *he has no knowledge.* Yet by the simple device of beginning with *false premises,* the plaintiff's counsel proves that the defendant did that impossible thing.

The plaintiff argues as follows: The check of $1,000 given by the bank to the plaintiff on August 19th, 1901, *was a part* payment on plaintiff's claim; a part payment on a claim is an acknowledgment of the claim; therefore the bank, by the payment of the $1,000, acknowledged plaintiff's claim.

The fallacy of the argument consists in *assuming* that the $1,000 check from the bank to the plaintiff was a *part* payment on plaintiff's claim.

Proof of a payment, merely, is ambiguous; a payment may be either (1) a part payment; or, (2) a payment in full; and when a payment is relied on as an acknowledgment to prevent the bar of limitations, the *burden is on the plaintiff* to prove that the *defendant intended* the payment, as a *part* payment, and not as a payment in full. *Wood on Limitations*, secs. 97, 98 and 104; 19 *Enc. of Law*, 2nd ed., 294 and 332–3; *Adams* v. *Olin*, 140 N. Y. 159–60; *Crow* v. *Gleason*, 141 N. Y. 493; *Beltzhoover* v. *Yewell*, 11 G. & J. 213.

The plaintiff himself *proved* the defendant's directors, did not think they owed him anything, but voted him the $1,000, at Mr. Furst's request, as a gift, or additional compensation, voluntarily paid to plaintiff, above what they had agreed to pay and had paid; which proved that they *did not* intend the $1,000 as a *part* payment, or acknowledgment of plaintiff's claim. And the *plaintiff also proved* that the defendant's directors, in voting him the $1,000, *could not* have intended to acknowledge his claim, for *"they didn't know anything about the claim."*

Nevertheless plaintiff's counsel says the jury ought to have been allowed to find that the *defendant's directors did intend* the $1,000 *as a part* payment, because the *plaintiff*, in a letter to defendant's cashier, said he (*the plaintiff*) received it in part payment.

This receipt, as plaintiff's counsel insists upon calling it, was put in the form of a letter; the words "part payment," are snugly interwoven in a sentence of sixty-five words, so as not to readily attract attention; and there is an entire absence of any express and straight-forward statement that the bank owed the plaintiff any more. This letter was received by the defendant's cashier and filed away; there is no evidence that any director of the bank ever saw it; and no reply was made to it. And plaintiff's counsel claims that the failure of defendant to reply to this letter, was an admission by defendant that the $1,000 check was a *part* payment on plaintiff's claim.

Upon defendant's objection the copy of this letter was admitted subject to exception, and was subsequently upon motion, excluded.

This ruling was correctly made on the ground that a plaintiff cannot *manufacture* evidence for himself by putting his contention in a letter and mailing it to the defendant.

Self-serving declarations, whether oral or in writing are not admissible in favor of the party making them. 9 *Enc. of Law*, 2nd ed. 5; 4 *Enc. of Ev.*, 100; *Simmons* v. *Haas*, 56 Md. 153, 166; *Gillis* v. *Morrison*, 22 New Bruns. 207, 212.

Such a declaration by plaintiff, in *defendant's presence*, may be admissible, to furnish ground for a presumption of acqui-escence, therein from defendant's silence, but this principle does not apply to defendant's *failure to reply to a letter* mailed to him by plaintiff. *Biggs* v. *Stueler*, 93 Md. 112.

If a man *says* to me: You owe me $500, or if he *hands* me a bill for $500, which I read; and I say nothing, my silence may be construed as an admission of the indebtedness charged, but the law does not require me to *enter into a correspondence* with my adversary, under penalty of being held to an admission of what he writes me.

Even if the plaintiff's letter were admissible defendant's failure to reply thereto is not evidence of acquiescence by defendant in its statement. *Biggs* v. *Steuler*, 93 Md. 100; see 5th prayer, p. 101, and this Court's opinion thereon, on pp. 112, 113.

The statements in plaintiff's letter are simply *plaintiff's declarations;* they might be admissible to show *plaintiff's intention* in receiving the $1,000; if *his* intention were relevant. But that is not the issue. It is *defendant's* intention, *not plaintiff's* that is material. The plaintiff is bound to prove, to repel the bar of limitations, an *acknowledgment by defendant* of an indebtedness to plaintiff beyond the $1,000; to prove this plaintiff must show that *defendant* intended the $1,000 as a *part* payment on an indebtedness to defendant. Authorities *supra* and *Scott* v. *Hickman*, 112 U. S. 150; *Roscoe* v. *Hale*, 7 Gray, 274; *Hughes' Est.*, 176 Penna. 387; *Keener* v. *Zartman*, 144 Penna. 179.

And *defendant's intention* cannot be proved by *plaintiff's declaration,* unless made *in defendant's presence.*   Plaintiff's counsel relies on the case of *Quynn* v. *Carroll,* 10 Md. 197. Mrs. Carroll made a payment to Quynn and took the following receipt. (10 Md. 198): "1853, May 11th, received of Jane M. Carroil, executrix of M. B. Carroll, three hundred and seven dollars and eighty-six cents, on account of services rendered said M. B. Carroll in his lifetime," (signed) "Wm. A. Quynn."

The Court held this receipt, in. connection with an entry in her testator's handwriting, legally sufficient evidence to repel the bar of limitations (pp. 208 and 209).

But *Quynn* v. *Carroll* is different from this case in the following particulars: (1) The receipt in *Quynn* v. *Carrall* was apparently *written by Mrs. Carroll,* or *her attorney,* and merely *signed* by Quynn; in this case it's a letter written by plaintiff. The exception says the receipt was *signed* by Quynn, and does not say that it was written by him (p. 198); and the opinion refers to the language of the receipt as Mrs. Carroll's *express admissions* (p. 208).

This indicates that *she* wrote the receipt, for what I *write* is my *express admission,* equally with what I *say;* whereas if Quynn wrote the receipt, the most the Court could have said would have been that Mrs. Carroll, by accepting in silence, *acquiesced* in its statements:

(2) The admission of the receipt in evidence was not objected to in *Quynn* v. *Carroll.*

(3) The receipt in *Quynn* v. *Carroll* was evidently *handed to Mrs. Carroll* or signed *in her presence,* and was not in the form of a letter sent by mail, as in this case.

This distinction is conclusive.


PEARCE. J., delivered the opinion of the Court.

This is an action brought by Timothy Ryan in the Circuit Court of Baltimore County against the Canton Nat. Bank of Baltimore County to recover for services rendered by him, the case being removed for trial to the Superior Court of Bal-

timore City. The declaration contained only the common counts, with which was filed the following bill of particulars:

"Canton National Bank of Baltimore County, Md.
To Timothy Ryan, Jr., Dr.

To 24 months and 23 days' services conducting the Tin Can Boxes and Specialty business at 714 Water St., Baltimore, Md., from February 27th, 1899, to March 21st, 1901, at $358.33½ per month $8,874.71

Cr.

By cash 24 months and 23 days monthly payments from February 27th, 1899, to March 21st, 1901, at sundry times on acct of said services........................................................................ $2,476.67
August 22nd, 1901. By cash on account of said services per receipt ....................................................................$1,000.00

$3,476.67

Balance due.......................................................$5,398.04"

The pleas were, "never promised as alleged;" "never indebted as alleged," and "the alleged cause of action did not accrue within three years prior to the bringing of this action." Issue was joined on the first and second pleas, and to the third plea there was a replication that the cause of action did accrue within three years before the suit was brought. The verdict and judgment was for the defendant, and the plaintiff has appealed.

During the course of the trial four exceptions were taken to rulings upon the evidence and a fifth exception to the ruling upon the prayers and upon the plaintiff's special exceptions to defendant's prayers, and the plaintiff's motion to exclude certain testimony which had been admitted in evidence subject to exception.

It appears from the bill of particulars filed with the declaration that the services rendered were terminated March 21st, 1901, and the suit was instituted August 11th, 1904. It also appears that all the monthly payments made for said services, were made before August 11th, 1901, and there is no claim made by the plaintiff that any person in behalf of the bank ever made any new promise to pay for said services, or ever made any express acknowledgment of existing indebtedness therefore. It is contended, however, by the plaintiff, that the sum of $1,000 which is credited in the bill of particulars on

August 22nd, 1901, and which was in fact paid on that day, was a recognition or acknowledgment of such existing indebtedness, and that the bar of the Statute of Limitations, which would otherwise prevent recovery by the plaintiff, was thus removed.

The defendant contended that there was an express contract for the rendition of these services for the sum of $100 per month (which is shown by the bill of particulars to have been fully paid) and that the sum of one thousand dollars subsequently paid, on August 22nd, 1901, was a gratuitous payment, made solely because the plaintiff had become dissatisfied with his contract, and had appealed to the defendant for *additional* compensation after the termination of said services, not as a matter of right, but as of favor.

The plaintiff's contention is that there was no express contract or agreement as to the amount of compensation he was to receive for his services, and the monthly rate of compensation charged by him in the bill of particulars is based upon the profits of the business to the defendant during the rendition of these services as computed by the plaintiff himself.

The plaintiff submitted two prayers presenting his theory of the case, both of which were refused, and the defendant submitted two prayers, both of which were granted.

Whether there was, or was not an express contract, the plea of limitations must prevent recovery by the plaintiff, unless the payment of $1,000 made August 22nd, 1901, is held to be a recognition of existing indebtedness, and that question will now be considered, as presented by the defendant's following granted prayer: "The Court instructs the jury that according to the bill of particulars of plaintiff's claim filed among the pleadings, and the testimony of the plaintiff, the plaintiff's cause of action accrued more than three years before the bringing of this suit (and) that there is in this case no evidence legally sufficient to prove any new promise, or acknowledgment of the plaintiff's claim sufficient to remove the bar of the Statute of Limitations set up by the defendant's third plea, and therefore the verdict of the jury must be for the defendant."

The plaintiff testified that in February, 1899, the firm of Kirwan & Tyler was engaged in the manufacture of tinware, and being heavily indebted to the Canton National Bank, an arrangement was entered into between the said bank, Kirwan & Tyler and himself, by which they sold to him their plant, business, and stock in trade, for the sum of $6,000, and that thereafter and up to March 21st, 1899, the business was conducted in his name, but for the sole benefit and account of said bank; that this $6,000 was paid by him from the proceeds of his note discounted by said bank for that purpose, and that this note was subsequently paid out of the proceeds of said business; that he entered into the service of the bank on February 27th, 1899, and left it on March 21st, 1901, when the business was sold to the American Can Company; that his duty was to manage and supervise the whole business, and that when money was needed beyond the cash receipts of the business, it was procured upon his notes discounted by said bank with the endorsement of his brother Wm. P. Ryan, all of which notes were paid out of said business; that in October, 1899, in order to guard against the involving of his estate in event of his death, an agreement in writing was executed by the bank stating that the plaintiff had purchased said business at the instance and request of the bank and agreeing in consideration thereof "to hold safe and harmless, and to fully protect and satisfy the said Timothy Ryan Jr., because of his purchase of said business, and the said William P. Ryan because of his present and future indorsements on account of said business, it being the intention of this paper to fully protect the said Timothy Ryan, Jr., and William P. Ryan, and to save harmless from any loss, injury or liability, that may come to them, or be imposed on them by reason of the purchase and conduct of said business so purchased from Kirwan & Tyler." He further testified that the first arrangement above mentioned was made through the Kirwan & Tyler Committee of the bank, composed of Mr. Horner, Mr. Furst and Mr. Kendig, and that when the agreement was executed, Mr. Horner said, "I wish you success, and when the Ryan boys are satisfied we

will turn the business over to Kirwan & Tyler;" that when he
first began the business he drew $2.50 a day, but after one or
two weeks he went to see Mr. Furst and told him he could
not conduct that business; that he had to have living expenses,
and Mr. Furst suggested that he draw $100 a month for liv-
ing expenses, which he did; that this did not compensate him
at all and that he did not look upon it in that light.    In re-
ply to a question from his counsel how he arrived at the
monthly charge of $358.33 in his bill of particulars, he said
he considered his services as a bookkeeper were worth $150
per month, and that as he secured a position with the Ameri-
can Can Co. after the sale to it at $2,500 per annum upon the
recommendation of the bank, in which he had no books to
keep, he thought he was worth as much to the bank, and at
that rate $4,300 a year, the monthly payments would be
$358.33.

Being asked what were the circumstances of the payment of
$1,000 to him credited in the bill of particulars, he said he
received that check about August 19th, 1901, and was aston-
ished with the small compensation for his services; and he pro-
duced a copy of the receipt therefor which was admitted in
evidence subject to exception, and which was as follows:

"Mr. John W. H. Geiger,          Baltimore, Aug. 22, '01.
        Cashier Canton Nat. Bank.

Dear Sir : "The receipt of your check dated August 19th,
1901, for the sum of one thousand dollars in part payment for
services rendered Canton Nat. Bank in conducting the Tin Can
Boxes and Specialty business at 714 Water St., Baltimore,
February, 1899, to March, 1901, and which was purchased by
me at the instance and request of the Canton Nat. Bank is
hereby acknowledged.                    Timothy Ryan, Jr."

He said that after receiving this check he spoke twice or
three times to Mr. Furst "about the meagreness of his reward"
and that Mr. Furst said he was "sorry it was not more, that
that was the best he could do ; the directors were not inclined
to give me anything ;" that he knew Mr. Furst was a liberal
man and did the best he could. He explained that he did not
feel disposed to sue the bank until Mr. Furst left the directory,

and it subsequently appeared in proof that Mr. Furst withdrew in 1902. The plaintiff produced the expense account kept by him while he conducted this business and rendered monthly to the board of drectors which showed that during that period he regularly drew $100 per month without indicating for what this sum was drawn. He also testified that on March 22nd, 1901, he paid to the bank $35,000 in cash and stock of the American Can Company, being the purchase-money of the plant and business sold to it; that on July 2nd, 1901, he paid said bank $14,000 from collections made from said business, and on March 27th, 1902, $550.08, being final settlement of said business, without deducting from any of said payments anything whatever for the compensation claimed in this suit.

On cross-examination, he said he was engaged as a book-keeper at $780 a year when he entered the defendant's service, and that the highest salary he had ever received at that time was $1,200 a year, in a position in the Water Department, which Mr. Furst aided him to secure, and that he was green at the tin business when he took charge of it; that neither the Canton Bank nor any one in charge of it agreed to pay him $4,300 a year, but that he fixed that amount by putting his services as book-keeper at $1,800 a year, and his other services at $2,500 a year; that he studied this out in his mind in September or August, 1901, and that at the time he received the $1,000 check he thought he was entitled to half the profits which were $14,000. When asked where his salary account was he said "you are looking at it now, my salary or expense account," that being the expense account before mentioned herein. He admitted that he had never sent any bill for services or made any demand therefor, before instituting this suit, and the check for $1,000 was produced, which bore no evidence for what it was given. He testified that when he received the $35,000 from the American Can Company, he so informed Mr. Horner, who told him to keep the check and get a settlement with the bank, but he replied that the money belonged to the bank which would treat him right, and he would not keep the check, though Mr. Horner said they

would not treat him right. Mr. Horner was not produced as a witness in the case but it was shown that his illness was such as to make it impossible to take his testimony. The plaintiff admitted that until this suit was brought the directors of the bank knew nothing about the claim which is made in this suit. On re-direct examination, his counsel asked him this question —"Mr. Ryan, in your last answer you said the bank didn't know of your claim until you brought suit, didn't these directors with whom you—How did they know it." He replied "I told them repeatedly. They knew all the trouble I had with Mr. Kerwin," to which his counsel said "We aren't discussing trouble. Talk about your claim. Did any member of the committee know about your claim?" Answer. "Mr. Furst knew of my claim. I told him I was dissatisfied with the reward I had gotten." There was no other testimony for the plaintiff.

Mr. Furst testified for the defendant "that he suggested Mr. Ryan for this position and asked him whether he would accept the employment, and he said he would; that he told him the pay would be better than he was then getting, which he said was some $700 ; that he told the committee Mr. Ryan's services could be secured, and suggested that he be given $100 per month, to which the committee agreed, and, the plaintiff was engaged to manage the Kirwan & Tyler business for the bank, and he continued in charge till the business was sold out." After this sale, Mr. Furst says, "there was some $5,000 or $7,000 over what Kirwan & Tyler owed us, and I went before the board and said before paying this to other parties whom Kirwan & Tyler owed, I thought the Ryan boys ought to receive some remuneration as they worked faithfully and diligently and I thought $1,000 apiece would not be amiss, and it was granted. I considered this a gratuity for he agreed to come with us for $100 a month ; after three years it came to me like a clap of thunder out of a clear sky, when I found he had sued the bank for services. I never was more surprised as I had been a lifelong friend, *and he never came to me regarding it.*"

During the examination of Mr. Furst, the minutes of the meeting of the directors of the bank on June 26th, 1901, were read in evidence, and among the proceedings was the following:" The Kirwan committee recommended that Messrs. Wm. P. Ryan and Timothy Ryan, Jr., be each paid $1,000 for their services; also that the balance of money on hand due the account be referred to the bank's attorney (Mr. Brinton) for settlement, and recommend that it be paid to Mr. Geiger as far as it goes to satisfy his claim.    Both recommendations unanimously agreed to." Being examined in reference to this recommendation, he said he was positive that he told the plaintiff when he first spoke to him about this employment that he would try to get him $100 a month, and he agreed to come with them for $100 per month before the purchase from Tyler & Kirwan, that he, Furst, reported this to the committee and the committee confirmed it; that the committee acted as a whole, and afterwards would report back to the bank every week.    He also said that after the plaintiff received the $1,000 he said he thought he and his brother ought to have more, and that he told the plaintiff it was the best that could be done for him.    He said a number of the directors thought the bank had no right to pay any more to plaintiff because he had agreed to come for $100 per month, and that this was the last said on the subject until the suit was brought.    The cashier, Mr. Geiger, testified that he delivered the $1,000 check to plaintiff's brother for him at his house, he not being at home, and that he could not recall any letter accompanying the check, but he delivered the check to Mr. Wm. P. Ryan together with that to Timothy Ryan, Jr., on the day the check was drawn.

Mr. Kendig testified that he was one of the Kirwan & Tyler Committee; that Mr. Furst reported to the committee the arrangement proposed with Mr. Ryan, and the committee recommended to the board of directors its acceptance, which was approved and that the arrangement was that Mr. Ryan should be employed at $100 per month, and that to the best of his knowledge neither the committee nor the board of directors ever had any intimation of any other contract than that

stated, and that neither Mr. Horner nor anyone else ever re-
ported to the committee or the board of directors that the
business was to be turned back to Kirwan & Tyler after the
Ryan boys were satisfied.    Messrs. Hubert, Leach, McGrath
and Codd testified that they were directors of the bank at the
time plaintiff had charge of the Kirwan & Tyler business; that
the committee reported to the board that they had employed
Mr. Ryan and had agreed to give him a salary of $100 per
month, which was approved by the board, and that they had
no notice or information of any other agreement with Mr.
Ryan.    Mr. Leach further said that Mr. Furst introduced the
question of contributing $1,000 to Mr. Ryan after the sale of
the business, and that he objected because he thought they
had no right to give the stockholders money in that way.  We
have, thus referred to, and noted all the testimony in the case,
as well that of the defendant as of the plaintiff, bearing upon
the defense of limitations, in order that the question may be
considered in the light of all the evidence.

It was contended for the plaintiff that his cause of action did
not accrue until March 29th, 1902, when he made the final
payment of $550.08 to the bank from the receipts of the busi-
ness, since according to his testimony, Mr. Horner said the
business was to be turned over to Kirwan & Tyler "after the
Ryan boys were *satisfied*," and since he could not fix any
amount which would *satisfy* him until the business was wound
up and the net profits were determined.    But this contention
cannot be entertained.

There is no natural connection between the value of an em-
ployee's services and the net profits of the employer.  Faithful
services *according to the tenor of the employment*, deserve the
same compensation whether the business succeed or fail.  Were
it otherwise the relation of employer and employee, would be
convered into a *quasi* partnership, sharing in profit and loss,
and there is not a particle of evidence in this case to sustain
such a theory.    Apart from this view, if the cause of action
did not accrue until Ryan was *satisfied* there could be no defi-
nite time when it would accrue.  It would accrue only when

it might suit him to declare what amount would *satisfy* him, and he could thus indefinitely arrest the running of the statute. Moreover, the agreement of October 14th, 1899, which guar- antees "to protect and *satisfy* the said Timothy Ryan, Jr.," makes it perfectly clear that the *"same satisfaction"* was meant in both instances, namely, in the language of said agreement "to *protect and satisfy* the said Timothy Ryan, Jr., because of his purchase of said business, and the said Wm. P. Ryan, because of his present and future indorsements on account of said busi- ness, * * * and to save harmless from any *loss, injury or liability* that may come to them or be imposed on them by reason of the purchase and conduct of said business." Wm. P. Ryan was indorser of Timothy Ryan, Jr., upon certain notes given by him in the conduct of this business and not an em- ployee of the bank, and the fact that he was guaranteed the same protection and satisfaction, as Timothy Ryan emphasizes the purpose to assure only indemnity against *loss* and not com- pensation for *services*.

We may therefore dismiss that theory of the plaintiff as to the application of the Statute of Limitations, and take up the next contention, that the payment of the $1,000 on August 22nd, 1901, was a part payment upon the plaintiff's claim, which avoids the statute.

It is difficult to understand how one can acknowledge an indebtedness the existence of which is unknown to him, and the testimony of the plaintiff himself, which we have recited, s, that until he brought this suit, the bank did not know of his claim. But waiving this view of the case, let us inquire if the payment of this $1,000 can be held to be a part payment of a larger indebtedness, such as alone can avoid the statute. This is essentially a question of intention on the part of the bank. In 19 *Enc. of Law*, 2 ed., p. 294, it is said, "An admission or acknowledgment must be deliberately made, and not inad- vertently, and it will not affect the bar of the statute where the accompanying facts and circumstances are such as to repel the inference, or leave in doubt the question whether the party intended thereby to prolong the period of limitation, or to re-

move the bar already attached.  *Fort Scott* v. *Hickman*, 112
U. S. 150."  And where the plaintiff, in stating or making
out his case shows that the cause of action accrued more than
the statutory period before the bringing of the suit, the bur-
den is upon him to show facts which take the case out of the
statute.    19 *Enc. of Law*, 2 ed., p. 323.

Mr. Wood in his work on Limitation of Actions, sec. 97
says: "In order to make a money payment a part payment
within the statute, it must be shown to be a payment of a
portion of an admitted debt, and paid to and accepted by the
creditor as such, accompanied by circumstances amounting to
an absolute and unqualified acknowledgment of more being
due, from which a promise may be inferred to pay the re-
mainder.    If the payment was intended by the debtor to be a
payment of all that was due, the circumstance of the creditor
having received it and treated it as a part payment only, will
not bring it within the statute.    Part payment of a debt is not
of itself conclusive to take the case out of the statute.    In
order to have that effect, it must not only appear that the pay-
ment was made on account of a debt, but also on account of
the debt for which action is brought, and that the payment
was made as part of a larger indebtedness, and under such
circumstances as would warrant a jury in finding an implied
promise to pay the balance; and if the payment was made un-
der such circumstances as to rebut any such promise it does
not affect the operation of the statute.    *    *    *    If it stands
ambiguous whether the payment is part payment of an exist-
ing debt, or whether the payment was intended by the party
to satisfy the whole of the demand against him, the payment
cannot operate as admission of a debt so as to extend the
period of limitation."

The leading case in support of these principles is *Tippets* v.
*Heane*, 1 Crompton, Meeson & Roscoe, 252.    In that case in
an action on an open account, it was shown by a witness that
he had paid ten pounds to the plaintiff by direction of defend-
ant but he could not speak to the account on which it was
paid.    There was a verdict for plaintiff, and upon the hearing

of a rule for a new trial, Baron Parke delivered an opinion so brief as to properly permit its reproduction here entire. He said, "This rule ought to be made absolute. There was not in my opinion sufficient evidence to go to the jury of this being a part payment so as to take the case out of the Statute of Limitations. In order to take a case out of the statute by a part payment, it must appear in the first place that the payment was made on account of a debt. That was left in ambiguity in the present case. Secondly, it must appear that the payment was made on account of the debt for which the action is brought. Here the evidence does not show any particular account to which the payment was applicable. The jury seem to have considered it as a payment of part of the debt in question; and perhaps, as there was no other account found to be in existence between the parties, they might be warranted in so doing. But the case must go farther; for it is necessary in the third place to show that the payment was made as part payment of a greater debt, because the principle upon which a part payment takes a case out of the statute is, that it admits a greater debt to be due at the time of the part payment. Unless it amounts to an admission that more is due, it can not operate as an admission of any still existing debt. Unless then in the present case, it could be collected that the payment was in part of a greater debt, the statute was a bar, and there being no evidence from which a jury were warranted in coming to such a conclusion, the present rule must be made absolute."

In the later case of *Mills* v. *Fowkes*, 5 Bing. N. C. 249, in considering whether a payment was such a part payment as took the case out of the statute, Tindal, C. J., said, "The law has been correctly laid down in *Tippets* v. *Heane*, that in order to have that effect, the payment must expressly be made in discharge of part of a larger debt which accrued six years or more before the payment." And in *Beltzhoover* v. *Yewell*, 11 G. & J. 216, where the same question was under consideration, Judge Dorsey said it must appear "that the debtor having full knowledge of the charges in the account, to which

the statute was a bar made the payment recognizing its validity," and he cited in support of this language *Mills* v. *Fowkes, supra.*

We have not overlooked the fact that in the minutes of the meeting of the bank directors at which these payments of $1,000 were ordered to the plaintiff and his brother, they are ordered as payments "for their services," but this does not in any manner affect the question before us. They knew of the plaintiff's services, but according to all the proof in the case they believed the plaintiff had agreed to render these services for the sum of $100 per month, as authorized by them, and which had been fully and regularly paid. They knew of no indebtedness actually existing, or claimed to exist, for according to his own testimony they did not know he claimed a dollar to be legally due and owing. All that they knew was that he was dissatisfied with the payment he had received and thought liberal treatment required he should receive something additional. This payment cannot be properly regarded as anything more than a concession to his dissatisfaction, the expression of a desire to be liberal beyond their legal obligation.

This is emphasized by the fact that though Wm. P. Ryan had sustained no contractural relation to them, had rendered no services for which he could have maintainad an action against them, and had never so far as the record discloses, made any demand for compensation, they extended to him the same measure of liberality in consideration of his indorsements for his brother in their business, and as to which they had agreed to protect him against loss.

Nor have we overlooked the fact that the receipt given for this payment expresses it to be a part payment for these services. Such self-serving declarations are not evidence unless part of the *res gestæ* or unless made in the presence of the opposite party and acquiesced in by him. 9 *Enc. of Law*, 2d ed., p. 5. Here the declaration was contained in a paper written three days after the date and delivery of the check, and sent through the mail to the defendant's cashier so that it cannot be contended it was part of the *res gestæ.* It was not

in response to any statement or declaration eminating from the adverse party. *Simmons* v. *Haas*, 56 Md. 166. Mere acceptance by the cashier of this receipt was not acquiescence with the declaration of part payment. Such a paper sent through the mail or by messenger has not the force and effect of a verbal statement in the presence of the adverse party or his authorized agent. *Biggs* v. *Stueler*, 93 Md. 112.

Whether treated as a letter or as a receipt, it was properly stricken out on motion for that purpose, having been admitted subject to exception. Much reliance was placed by the plaintiff upon *Quynn* v. *Carroll*, 10 Md. 209, but there is no real conflict between that case and our decision in the present case. The facts in the two cases are radically different, the present case being very similar to *Beltzhoover* v. *Yewell*, 11 G. & J. 212, which as pointed out by JUDGE LEGRAND in *Carroll* v. *Quynn*, differed materially from that. There being no evidence in our opinion, sufficient to warrant a jury in finding the facts necessary to remove the bar of the statute in this case, we think the defendant's third prayer was properly granted, and as this view requires the affirmance of the judgment, it is unnecessary to consider any other point in the case.

*Judgment affirmed with costs to the appellee above and below.*

(Decided June 14th, 1906.)