# FIRST NATIONAL BANK OF UNION BRIDGE

*vs.*

## W. SCOTT WOLFE AND WIFE.

---

## MEDA E. WOLFE

*vs.*

## FIRST NATIONAL BANK OF UNION BRIDGE.

*Forgery of Signature—Estoppel to Assert.*

Defendant, who, after being informed by plaintiff bank that her name appeared on a note discounted by the bank for her husband, failed to inform the bank that her purported signature was a forgery, with the result that the husband's assets were applied to the payment of his other obligations, including notes held by another bank on which both husband and wife were liable, leaving nothing for the payment of plaintiff bank, was estopped to assert the forgery as a defense to the note.

*Decided February 8th, 1922.*

Appeals from the Circuit Court for Carroll County (MOSS, J.).

Two actions by the First National Bank of Union Bridge, Maryland, against W. Scott Wolfe and Meda A. Wolfe, his wife. From an order in the one case, reducing a judgment by confession against defendant Meda A. Wolfe, both plaintiff and said defendant appeal, and from an order in the other case, striking out a judgment by confession against said Meda A. Wolfe, plaintiff appeals. Both orders reversed.

The causes were argued together before BOYD, C. J., THOMAS, PATTISON, URNER, ADKINS, and OFFUTT, JJ.

*F. Neal Parke,* with whom were *Ivan L. Hoff* and *Bond & Parke* on the brief, for the First National Bank of Union Bridge.

*Frank L. Stoner,* with whom was *Edward O. Weant* on the brief, for Meda E. Wolfe.

PATTISON, J., delivered the opinion of the Court.

On the 10th day of January, 1921, a judgment by confession was entered in the Circuit Court for Carroll County, in favor of the First National Bank of Union Bridge, Maryland, against W. Scott Wolfe and Meda E. Wolfe, his wife, upon the power contained in a note for the sum of $1,500, dated the 15th day of June, 1921, payable in six months thereafter to said bank, with the names of W. Scott Wolfe and Meda E. Wolfe attached thereto as makers. And on the 19th day of the same month (January, 1921) another judgment was entered in that court in favor of said bank against Wolfe and his wife upon the power in a like note, dated July 14th, 1920, for said sum, payable as the other, in six months thereafter, to said bank with the names of Wolfe and his wife attached thereto.

On the 14th day of April, 1920, Meda E. Wolfe, the wife, filed a motion in each of the two cases asking that the judgment entered therein against her be stricken out, because, as she alleged therein the name, "Meda E. Wolfe," appearing to each of said notes was not signed by her or by her authority, but was a forgery.

The two cases, upon the motions filed, were heard together by the court.

In the first of these cases the court granted the motion to the extent of reducing the judgment of $1,500 entered therein against Meda E. Wolfe to $1,283.66; and in the second case the motion was granted and the judgment therein against Meda E. Wolfe, for $1,500 was stricken out.

In the first case both Meda E. Wolfe and the bank appealed from the order of the court, and from the order in the second case the bank appealed. The appeal and cross appeal in the

first case, No. 112 of the October Term of this Court, and the appeal in the second case, No. 113 of the same term, are before us in one record.

It is in evidence that on or about the 15th day of December, 1919, W. Scott Wolfe obtained from the First National Bank of Union Bridge a loan for the sum of $1,500 upon the faith or credit of himself and wife, as testified to by him, after he had given to the bank a statement of the specific property owned by him and his wife.

To secure the loan Wolfe gave to the bank a note for said sum, dated the 15th day of December, 1919, payable to the bank six months thereafter. To which note was attached the name of himself and wife. Upon the receipt of the money obtained on said note, Wolfe opened an account with the bank in the name of "*W. S. Wolfe and Co.*"

On the 14th day of January, 1920, Wolfe obtained a second loan from the bank for the same amount, and to secure that loan he gave to it a like note for $1,500, payable in six months thereafter, with the name of himself and wife attached thereto as makers.

These notes became due on the 19th of June and the 14th of July, 1920, respectively, and not being paid when due, they were renewed for another six months by notes for the same amount purporting to have been signed by Wolfe and wife as makers.

It was upon these last mentioned notes, falling due on the 15th day of December, 1920, and the 14th day of January, 1921, respectively, that the judgments involved in this case were entered.

At the time Wolfe obtained said loans from the bank, and prior thereto, he was conducting a coal business in the town of New Windsor, Carroll County, Maryland, about four miles from Union Bridge, and at which place he resided with his family.

On July 13th, 1920, Meda E. Wolfe wrote to the First National Bank of Union Bridge saying: "Advise me if you

hold any notes for which I am given as security; also wish to advise you to accept no notes on which my name appears as security."

She was induced to write the above letter because, as stated by her husband, she was told by a woman of her neighborhood, "that some of the people did not have as much money as was given to them." This, he said, made her a "little suspicious," and "she wrote to different banks to know if her name was on any paper."

This letter, Mr. Olmstead, cashier of the First National Bank of Union Bridge, said, was received at the bank after the renewal note of July 14th was delivered to the bank; that on the day following its receipt he wrote Mrs. Wolfe telling her they had two notes, each for the sum of $1,500, and he gave to her the date of each note.

The letter to her from the bank was misplaced or lost; at least, it does not appear in evidence; but Mrs. Wolfe and their son, James, who was at the time engaged in the drug business at New Windsor, both testified that it was said in the letter to her that she was on notes therein amounting to *$1600*, while her husband testified that the letter stated that there were two notes in the bank upon which her name appeared amounting to *$1500*.

Upon the receipt of the letter from the bank, Mrs. Wolfe sought the counsel of Mr. Stoner, a well known attorney of the Frederick bar, and her attorney in this case, and, after telling him of the signing of the notes by her husband without her knowledge or authority, she was advised by him to have her husband turn over his business to her to protect her against any loss she might sustain by reason of such alleged forgeries. This advice was received a few days, or a short time only, after the receipt of the letter from the bank, and, pursuant to the advice of her attorney, a paper writing was prepared by her son, which was referred to by the witnesses as a power of attorney, authorizing the son to take over and conduct the coal business of the father. This paper was signed by W. Scott Wolfe, and the business was

taken over by the son, in the management of which he was materially assisted by his mother.

About a week after executing the power of attorney, Wolfe left his home and went to the cement plant at Union Bridge, where he worked as a laborer for a week or two, when he was taken sick and returned to his home, and upon his recovery, about two weeks thereafter, he went back to the coal yard, as his son had said "he did not want anything more to do with it."

In the meantime much of the coal had been sold, and the money received therefor, amounting to $1,283.66, had first been deposited in the First National Bank of New Windsor to the account of Meda E. Wolfe, and thereafter applied by her to the payment of notes in that bank, among them two notes, one for $500 and the other for $300, which, she admitted, she had signed for her husband.

How long W. Scott Wolfe thereafter conducted the coal business, and what he realized therefrom, is not shown from the record, although it is disclosed by it that at the time the case was heard in the court below, in May, 1921, and for six weeks prior thereto, W. Scott Wolfe was not living at home with his family, but was employed as a laborer in the cement plant at Union Bridge.

In speaking of the letter of Mrs. Wolfe to the bank, dated July 13th, 1920, Mr. Olmstead, the cashier, said that upon receipt of it he thought it was "peculiar" that she should inquire "whether such notes were there," but when she failed to reply to his letter he then felt that everything was all right; and it was not until March, 1921, when these proceedings were instituted in the court below to strike out the judgments, that he, or the officials of the bank, had any information of the claim made by Mrs. Wolfe that she had not signed, or authorized her husband to sign, the notes upon which the judgments were entered.

About the time these notes became due the bank learned of the negotiations going on for the sale of certain real estate owned by Mrs. Wolfe in Union Bridge, and it was this fact

that caused the bank to enter up judgments on the notes. The entry of the judgments, it would seem, was not known to Mrs. Wolfe until discovered by the attorney, employed by the purchaser of the property to examine her title thereto preparatory to its conveyance to the purchaser; and then it was that the proceedings to strike out the judgments were instituted.

It is also in evidence that this property, which was about to be sold by Mrs. Wolfe at and for the sum of $1900, was sold some years before by Mr. Wolfe, as trustee, and, at the sale made by him, Mrs. Wolfe was returned as the purchaser of the property, presumably for the sum of $1300 or thereabout, as it is disclosed by the record that Mr. Wolfe paid $1000 of the purchase money and his wife $300. In the sale of it by Mrs. Wolfe, it was agreed by her and her husband that he should receive of the purchase money $1000 to reimburse him for what he had paid upon the purchase money at the sale when she was returned the purchaser. The sale, however, by her, as well as the agreement with her husband that he should be paid $1000 of the purchase money, was blocked because of the liens on the property resulting from the entry of said judgments.

At the hearing upon the motions to strike out the judgments Wolfe, who at 12 o'clock at night was called by his wife and son from his bed where he at the time was asleep, to sign the power of attorney, turning over his business to his son, and who also, at his wife's request, pending the sale of the Union Bridge property, after she had learned of the entry of the judgments, had written a letter to Mr. Stoner confessing his guilt in the forgery of the notes, testified that he, and not his wife, signed the notes upon which the judgments were entered, as well as the notes of which there were renewals, and that he had no authority from her to sign them. Mrs. Wolfe, the wife, also testified to the same effect. It was also the opinion of the son that the name of his mother attached to the notes was not in her handwriting.

The law applicable to cases of this character is that one, by his conduct or even by mere silence, may estop himself from defending against the payment of a note on the ground that the signature thereto was a forgery, if it be shown that the holder, in relying thereon, was misled thereby to his injury, provided it be further shown that it was the duty of the party, and he had an opportunity, to speak. *Hardy* v. *Chesapeake Bank*, 51 Md. 562; *Shinew* v. *First National Bank*, 84 Ohio St. 297, 24 Annot. Cas. 912 C. 587; *Viele* v. *Judson*, 82 N. Y. 32; *Wiser* v. *Lawler*, 189 U. S. 260; *Dominion Bank* v. *Ewing*, 7 Ont. L. Rep. 90 (affirmed in 35 Can. Sup. Ct. 133), and others; or, as stated by *Mr. Daniels* in his work on *Negotiable Instruments*, vol. 2, sec. 1353, "If a person whose name has been forged knows that the holder, the bank, is relying upon the forgery, he will not be permitted to remain silent to its injury."

If the name of Mrs. Wolfe upon the notes was forged by her husband, she knew of it as early as July, 1920, for she in her testimony stated that she was told by the letter from the bank that her name appeared upon notes in that bank amounting to $1,600; and while she does not say that she was told that the notes upon which her name appeared were those placed there by her husband, her subsequent conduct discloses that she so understood it, and whether or not she was mistaken in her recollection as to the amount of said notes is not material in the decision of this case. But it is more than probable that she was mistaken, for at the time the letter was written to her the second renewal note of July 14th, 1920, had been left at the bank, and we can conceive of no reason for it stating the amount of the notes upon which her name appeared with her husband to be less than it really was.

The information she acquired by the letter was promptly furnished her at her request, as she asked to be advised "if the bank had any notes for which she was given as security."

Upon the receipt of her letter the bank might well have thought that she had some reason for seeking the informa-

tion, and, as its cashier said, he thought it "peculiar" that she should have asked for it. But, if her inquiry caused the bank any apprehension as to the genuineness of her signature, it was naturally allayed by her silence thereafter. When her inquiry was answered, and she was told that her name appeared upon notes in the bank, which she says were forgeries, it was her duty to inform the bank of that fact, which she had full opportunity to do, but did not do. Her reason for not doing it is disclosed by her subsequent conduct, for had she written to the bank, telling it of the alleged forgeries of her husband, she would have been prevented, in all probability, from following the course she pursued of taking over and disposing of the property and assets of her husband, and applying the proceeds thereof to the payment of those notes of his which she admitted that she had signed with him, and the payment of which she could not escape by the defense of forgery.

We need not, we think, discuss to any extent the evidence, with the view of showing that her silence and conduct misled the bank to its injury. The bank was relying upon the forged note for the money that it had loaned to her husband upon both the credit of him and her. She, instead of informing the bank of the alleged forgeries, so that it could have taken steps at that time towards protecting the bank against the loss resulting from them, took over the only assets of her husband and disposed of so much of them as was necessary to the payment and satisfaction of other notes, upon which she was security for her husband upon her own admission, and, when this was accomplished, she, indifferent to the interest of her husband's creditors generally, permitted him to dispose of the balance of his assets, without regard to the application of the proceeds received therefrom.

It is clear to us, from the facts of this case, that it was the duty of Mrs. Wolfe, when told by the bank that her name appeared upon notes held by it, to have informed the bank of the alleged forgeries, and that her silence, when she could

have spoken, and her conduct thereafter, upon which the bank relied, misled it to its injury, and that she, by such silence and conduct, was estopped from raising the question of her liability because of said alleged forgeries.

The judgment in each of the cases should, we think, stand as it was entered, and consequently the court below, in our opinion, erred in reducing the first judgment as it did, and in striking out the second, and we will therefore reverse the order in each case.

> *Both orders of the court below reversed and the judgment in each case to stand, as entered originally, Mrs. Wolfe to pay the costs in each case.*