## MOHR *v.* UNIVERSAL C. I. T. CREDIT CORPORATION

[No. 148, September Term, 1957.]

198

*Decided March 27, 1958.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

Submitted on brief by *John Brockenbrough Fox* for the appellant.

*Eli Baer* for the appellee.

HORNEY, J., delivered the opinion of the Court.

Carl H. Mohr (Mohr) in an action against Universal C.I.T. Credit Corporation (C.I.T.), in the Circuit Court of Baltimore City (Oppenheimer, J.) sought a declaratory decree providing that a conditional contract of sale of an automobile, purportedly executed by Mohr to Suburban Nash, Inc., (Suburban), a dealer in automobiles, and assigned by Suburban to C.I.T. was null and void because the signature thereon was a forgery. C.I.T. denied that Mohr's signature was forged, and claimed that even if it were, he was estopped to deny the validity of the lien [1] created by the conditional contract of sale. The chancellor found that the purported signature was in fact a forgery, but ruled that Mohr was estopped to assert the forgery as a defense to the lien. From the decree passed by the chancellor in accordance with his finding Mohr appealed.

On February 28, 1955, a conditional contract for the sale of a Nash automobile, bearing the purported signature of Mohr as the buyer, was assigned by Suburban to C.I.T. C.I.T. paid $2,200 to Suburban for the contract which was immediately recorded in Baltimore City where Mohr resided, but a certificate of title showing its lien noted therein was not delivered to C.I.T. on the date the contract was purchased.

---

1. For brevity and in accordance with common usage (exemplified by the form of certificate of title issued by the Department of Motor Vehicles), we shall refer in this opinion to the security interest of the vendor under a contract of conditional sale as a "lien", even though the term may not be strictly applicable to a reservation of title.

About two months later, on April 28, 1955, Mohr borrowed $2,200 from the Second National Bank of Towson (the Bank), purchased the same Nash automobile from Suburban, and executed a chattel mortgage to the Bank. The Bank promptly recorded the chattel mortgage in Baltimore City. On the same day Mohr purchased the automobile, he applied to the Department of Motor Vehicles (the Department) for a certificate of title. When the title was issued on the same day, there was no notation of a lien in favor of the Bank. The next day, April 29, the Bank contacted Mohr and demanded that a notation of its lien be entered on the title. Mohr requested the Bank to return the title to Suburban, whereupon he went to Suburban and signed in blank an application for a duplicate title so that the lien of the Bank could be inscribed thereon. Apparently someone at Suburban indicated on the application for a duplicate that the lien was in favor of C.I.T. The Department issued the duplicate title on April 29 showing a lien in favor of C.I.T., and mailed the duplicate to C.I.T. Someone at Suburban, by using a typewriter equipped with "pin-point" type, similar to that used in the Department to note the existence of liens, typed on the original title the notation of a lien in favor of the Bank, and returned the original to the Bank. Thus, two titles were outstanding on the same automobile, each showing a lien in favor of different lienors.

Immediately after recording its contract on March 1, 1955, C.I.T. mailed to Mohr's residence, 2135 West Baltimore Street, a number of documents in three separate envelopes including (i) a policy of automobile insurance, (ii) a credit life insurance policy, an accident policy, a bail bond certificate and a credit identification card, and (iii) a payment book and account record which Mohr was to use in making payments to C.I.T. The branch manager testified that it was customary for C.I.T. to mail such documents to the customer, but no copies of the accompanying letters were ever kept. There was testimony that each of the letters was mailed through "normal company procedure", and that, although the envelopes bore a return address, none of them was ever

returned to C.I.T. Mohr denied receipt of any letters or documents from C.I.T.

C.I.T. received ten payments of $95.68 each, the monthly sum stipulated in the contract. A coupon out of the same payment book, which had been sent by C.I.T. to Mohr, was attached to each payment. The payments were made by checks of Suburban. It was not unusual for customers to make payments to dealers, who would in turn make payment to the finance company by the check of the dealer. On June 28, 1955, a payment was made for only $93.68, two dollars less than the payment required by the contract. A form letter was addressed to Mohr by C.I.T. to his home address, requesting payment of the deficit. The next day a representative of Suburban paid the two dollars due in cash to C.I.T. Payments to C.I.T. terminated on January 28, 1956. Suburban went out of business soon thereafter. C.I.T. demanded from Mohr the remaining $1,913.60 due under the contract, but Mohr disclaimed all responsibility for the debt.

Although Mohr's son was a salesman for Suburban, there is no evidence in this record that he knew of the fraudulent practices attributable to Suburban, but he was involved in the transactions which gave rise to *Mohr v. Sands,* 213 Md. 206, 131 A. 2d 732 (1957). There is also no evidence that the father and son were engaged one with the other in any illegal transactions. And no one from Suburban was called to testify as to the transactions that led to this litigation. There was proof, however, that the son did have access to the father's house. He had a key and it was "sort of a second home" to him.

The Bank was paid in full, presumably by Mohr, and it has no interest in the outcome of this litigation. Both C.I.T. and the Bank were unaware of the fraudulent practices carried on by Suburban.

The chancellor found as a fact that Mohr received the mail addressed to him from C.I.T. and we are unable to find that the chancellor was clearly erroneous. Maryland Rule 886 a. The branch manager of C.I.T., in addition to other testimony as to its practice with respect to addressing and mailing letters, documents, and notices to its customers in

envelopes having a return address printed thereon, testified that: "The normal [company] procedure is that [the] coupon book and * * * notice [of the company's record of the transaction] is mailed out to the customer to the address that is noted on the record." Such testimony was admitted subject to exception, but no motion was subsequently made to strike it out. While proof of the custom was not as full as it might have been, we believe that it was sufficient for the chancellor to find, as he did, that there had been a substantial compliance with the universal rule to the effect that the receipt of a letter by the addressee is presumed, when it is shown that the letter, properly stamped and addressed, was posted in the mails. 1 *Wigmore, Evidence,* (3d ed. 1940), Sec. 95, and cases therein cited. The more recent Maryland rule, although it is the minority view, is that the mere existence of an office custom or practice without more, is sufficient to warrant a presumption that a particular letter was posted.[2] Proof of the custom may be established simply by proving the existence of a system of addressing and mailing, and that it was the invariable office practice to comply with such system. *Lawrence Bank v. Raney & Berger Co.,* 77 Md. 321, 26 A. 119 (1893); *Wolf v. Union Trust Co.,* 150 Md. 385, 133 A. 121 (1926). Cf. *Lansburgh v. Fish & Oyster Co.,* 153 Md. 312, 138 A. 269 (1927). See also *Goodman v. Saperstein,* 115 Md. 678, 81 A. 695 (1911), and *Kolker v. Biggs,* 203 Md. 137, 99 A. 2d 743 (1953), which are not directly in point, however, since the witness in each case testified that he personally mailed the letter in question. Testimony of the employee, whose duty it was to collect outgoing letters in the office of the sender and deposit them in

---

2. The majority rule, and the former Maryland view, was that mere proof of a business custom in the office of the sender to post mail which had been deposited in a particular location was not sufficient to raise a presumption of receipt. *Flack v. Green,* 3 Gill. & J. 474 (1831); *Bell v. Hagerstown Bank,* 7 Gill 216 (1848); *Brailsford v. Williams,* 15 Md. 150 (1860); *Williams v. Brailsford,* 25 Md. 126 (1866). And see *United States v. Decker,* 51 F. Supp. 15 (D. Md. 1943), in which Judge Chesnut pointed out the trend away from the older and stricter rule.

the mails, is no longer necessary. The testimony of any employee or officer, who has personal knowledge of the custom or practice used in his office to effect the addressing and mailing, is all that is required to raise a *presumption* of the receipt of a particular letter by the addressee.

The chancellor further found as a fact that the signature of Mohr on the conditional contract of sale had been forged, but he held that Mohr was estopped from asserting the forgery as a defense to the lien of C.I.T. on his automobile. We agree.

It is true, of course, that mere silence will generally not raise an estoppel against a silent party. *Furst v. Carrico,* 167 Md. 465, 175 A. 442 (1934). See also *Biggs v. Stueler,* 93 Md. 100, 48 A. 727 (1901), and *Ryan v. Canton National Bank,* 103 Md. 428, 63 A. 1062 (1906), with holdings similar to the *Furst* case. And see *Martin v. Call Carl, Inc.,* 202 Md. 399, 96 A. 2d 504 (1953). But when the circumstances are such as to require a silent party to speak so that an injured party may take steps to protect himself against a loss which might otherwise result, then the party, who has remained silent when it was his duty to speak, will be estopped from asserting the defense he would have had but for his silence. *First National Bank v. Wolfe,* 140 Md. 479, 117 A. 898 (1922); *Union Trust Co. v. Soble,* 192 Md. 427, 64 A. 2d 744 (1949).

In *Furst v. Carrico, supra,* a seller of goods on credit sued two alleged guarantors of payment. The supposed guarantors denied that they had signed a guaranty. The plaintiffs contended that the defendants were estopped to deny their signatures because they had made no reply (i) when notified that credit would be extended and the goods sold and delivered on the faith of the supposed guaranty, and (ii) when the supposed guarantors were notified of the failure of the buyer to pay in full. There we said, at p. 469:

> "Mere silence, standing alone, does not have * * * [the effect of an estoppel]. On the facts it must appear that the statements or charges, if wrong, would naturally, or with such great probability,

have brought contradiction, that absence of contradiction gave assurance of truth. And the fact that the failure to contradict was a failure to answer letters has an important bearing on the question of interpretation and effect to be given. * * * One party 'no more can impose a duty to answer a charge than he can impose a duty to pay by sending goods. Therefore a failure to answer such adverse assertions in the absence of further circumstances making an answer requisite or natural has no effect as an admission.' * * * Whether given facts do or do not show an admission sufficient to create the estoppel is a question to be disposed of by the court."

The issue of fact to be decided in each case, therefore, is whether the failure to reply to or otherwise contradict an assertion made by one party amounts to an assurance by the other party that the latter had in fact signed a note, guaranty or other instrument, or, by his indifference, carelessness, breach of duty or other conduct, had created an estoppel precluding him from asserting a defense he might otherwise have had.

In the case now before us there was something more than "mere silence, standing alone". There were additional "assurances" that Mohr had signed or assented to the C.I.T. contract. In addition to making the issuance of a duplicate certificate of title possible, he had, by his carelessness or breach of duty, permitted ten monthly payments on account of the alleged contract to be sent in his name to C.I.T. by the use of the same coupons which C.I.T. had mailed to Mohr when it had purchased the contract from Suburban. Or stated otherwise, since we have decided that the chancellor was not clearly erroneous in finding that Mohr had received the letters addressed and mailed to him by C.I.T., we must presume that he knew what happened to the documents enclosed in such letters. Therefore, because he failed to notify C.I.T. within a reasonable time that there was some mistake when he received the book containing the coupons and other documents, he was chargeable with knowledge of the fact

that on ten occasions the coupons had been returned to C.I.T. with the payment then due, and he cannot now deny the forgery. Not only did he cause C.I.T. to be lulled into a false sense of security, but his execution in blank of the application for a duplicate title prevented the prompt discovery of the fraudulent transactions at a time when C.I.T. might have been able to recoup its loss before Suburban went into receivership.

In *Home Credit Co. v. Fouch*, 155 Md. 384, 142 A. 515 (1928), a negotiable note, purportedly signed by the defendants to the order of Twele Electric Company, and payable in monthly installments, was assigned by Twele to the plaintiff. The defendants admitted signing an installment contract, but claimed that their signatures to the note were forged. The note and contract bore the same date. After the note had been assigned to it, the plaintiff wrote a letter notifying the defendants of the assignment of the note and enclosing a card referring to the terms of the contract. The defendants denied receipt of the letter, but admitted receipt of the card. They also claimed that the payments made on the note had not been made by them, but for them by a neighbor who had signed a similar contract. The case was tried before a jury and resulted in a verdict and judgment for the defendants. The plaintiff appealed claiming error in the rejection of one of its prayers and in the granting of one of the prayers of the defendants. We reversed the judgment and awarded a new trial. The plaintiff's prayer required a verdict for the plaintiff if the jury found there was no forgery. Conversely, the defendants' prayer directed a verdict for the defendants if the jury found that their names were forged to the note. We held that the plaintiff's prayer was properly rejected and that there was error in granting the defendants' prayer because it eliminated the possibility of the jury considering the doctrine of estoppel. At p. 396 we said:

> "The word 'precluded,' as used in * * * [Section 42 of Article 13 of the Code (1924)], is synonymous with the word 'estopped,' and it does not include ratification or adoption in their strict primary mean-

ing, but only when they involve some elements of an estoppel. * * * It seems well settled that estoppel precludes the defense of forgery, and may arise from conduct, silence, or laches, if by such conduct or silence the holder was misled to his prejudice."

And, at p. 398, we further said:

"What we have said in reference to the satisfaction slip [a certificate signed by the defendants to the effect that Twele had completed the work on its part to be performed under the contract, and acknowledging that they had signed a 'negotiable note in the amount of $......' in payment of the completed work] does not apply to the letter * * * alleged to have been sent by the plaintiff to the defendants informing them of the purchase of the note, for the reason that, if we admit that the defendants received such a letter, which they deny, it could not create an estoppel, because, at the time the letter was written, the plaintiff had discounted the note, and since that time nothing has occurred which would constitute legal prejudice to the plaintiff."

Upon careful consideration of the *Fouch* case, we believe that the conclusion on the facts of that case that nothing had occurred after the discounting of the note which would constitute legal prejudice to the plaintiff therein is not consistent with the earlier holding in *First National Bank v. Wolfe, supra,* or the subsequent holding in *Union Trust Co. v. Soble, supra.* We are of the opinion that the decisions in the *Wolfe* and *Soble* cases were correct and, therefore, we decline to follow the *Fouch* case on the facts presented by the present case.

In this State, as in other jurisdictions, as hereinafter pointed out, we have held that an estoppel may arise if the injured party was precluded from following a course of action by which he might have recovered his loss. And the law, when appropriate circumstances exist, requires the consideration of such possibility.

In the case of *First National Bank v. Wolfe, supra,* we held that an estoppel may arise where the injured party is precluded from recouping his loss. In that case, a wife wrote to the bank inquiring whether her name appeared "as security" on any notes held by it. The bank replied that her name appeared on two notes given to the bank by her husband. Her purported signatures were forgeries, but, because she failed to inform the bank of that fact, she was estopped from asserting forgery as a defense. Since the wife had not informed the bank of the forgeries "so that it could have taken steps at that time towards protecting the bank against the loss resulting from * * * [the forgeries]," she was liable for the payment of the notes.

It is said in 3 *Pomeroy, Equity Jurisprudence,* (5th ed. 1941), Sec. 812, that:

> "It is enough if the party has been induced to *refrain* from using such means or taking such action as lay in his power, by which he might have retrieved his position and saved himself from loss."

An excellent exposition of this theory appears in *Continental National Bank v. National Bank of Commonwealth,* 50 N. Y. 575 (1872), in which the Court, in pointing out that the law does not distinguish between damage received by action and omission to act, said: "When an act produces conduct from which flows injury, it cannot matter whether that conduct be affirmative or negative, active or quiescent."

The recent case of *Union Trust Co. v. Soble, supra,* is also in point. This was an action by certain depositors against their drawee-bank to recover the amount of a check which the bank had debited to plaintiffs' account. The bank had paid the check on an unauthorized indorsement. The plaintiffs received the cancelled check from the bank on August 1, but did not notify the bank until November 1 that the indorsement was unauthorized, although they had discovered it earlier. We held that "estoppel, such as will preclude the drawer of a check from setting up the defense of forgery or want of authority in the indorsement, may arise from any conduct, silence, or laches which misled the bank to its

prejudice." Applying the reasoning of the *Soble* case to the case now before us, it is clear that the prejudice to C.I.T. occurred because it was unable to proceed against the automobile or Suburban as soon as it might have, had it had notice of the forgery earlier. In the *Soble* case, as in this case, no inquiry was made as to whether the bank *or* finance company could in fact have been able to recover from the unauthorized indorsee *or* automobile dealer if it had been notified sooner. As was said in the *Soble* case, at p. 433:

> "It is not necessary to prove that benefit would certainly have accrued to the bank from an attempt to secure payment from the forger. The law presumes injury to the drawee from the drawer's delay, and will not enter into a calculation as to whether injury did or did not occur to the drawee."

As authority for the aforegoing statement we cited the Supreme Court case of *Leather Manufacturers' National Bank v. Morgan,* 117 U. S. 96 (1886). See also *Voorhis v. Olmstead,* 66 N. Y. 113 (1876), cited in the Supreme Court opinion.

The closest case on the facts to the instant case that we have been able to find is *Rothschild v. Title Guarantee & Trust Co.,* 204 N. Y. 458, 97 N. E. 879 (1912). This was an action by the devisees of a testatrix to compel the defendant to cancel a mortgage held by it on premises devised by the testatrix to the plaintiffs. The mortgage purportedly had been signed by the testatrix, but in fact her name had been forged. About one year after the making of the loan, the testatrix discovered the forgery, and caused the interest on the loan to be paid. Thereafter, interest payments were made regularly for three years. When the testatrix died, her devisees also discovered the forgery and sought cancellation of the mortgage. The Court held that, when the purported mortgagor acquired knowledge of the forgery, she could have remained silent and the mortgage would have been unenforceable against her or her devisees. But the payments of interest worked a different result, because the defendant, if it had known of the forgery, had a right to sue the forger.

Thus, when the interest payments were made, the defendant was justified in assuming that the mortgage was valid, and the ratification of the mortgage by the testatrix in her lifetime foreclosed the right of her devisees to repudiate it after her death. See also *Buck v. Wood*, 85 Me. 204, 27 A. 103 (1892).

The main difference between the *Rothschild* case, *supra,* and the case now before us is that the testatrix *admittedly* knew of the forgery, whereas in this case Mohr *denied* any such knowledge. We think, however, that the receipt of the letters, in which the book of coupons, and other documents, were enclosed, constituted constructive knowledge of the forgery, the concealment of which Mohr made possible by his conduct, silence and laches. Inasmuch as Mohr, in some unexplained manner, *permitted* payments to be made by Suburban to C.I.T., thereby lulling C.I.T. into a false sense of security, we believe that the burden was on him to explain how the coupons, which were addressed and mailed to him, were returned to C.I.T. with the payments called for by the coupons.

The decree of the lower court should be affirmed. Since the bill for a declaratory judgment directly and impliedly sought declaratory relief to terminate the controversy or remove an uncertainty existing between the parties, the chancellor, by his decree, should have declared that C.I.T. was entitled to enforce its lien against Mohr's automobile instead of dismissing the bill. Code (1951), Art. 31A, secs. 2, 3, 5 and 6. However, no harm was done by the dismissal of the bill. In effect the dismissal was tantamount to a declaration of the rights, status and legal relationship of the parties to the conditional contract of sale since it left C.I.T. with its lien on the automobile.

*Decree affirmed, the appellant to pay the costs.*