PAUL B. GANLEY ET AL. *v.* G AND W LIMITED PARTNERSHIP ET AL.

[No. 523, September Term, 1979.]

*Decided January 11, 1980.*

The cause was argued before MORTON, THOMPSON and LOWE, JJ.

*Clater W. Smith, Jr.,* with whom was *James H. Clapp* on the brief, for appellants.

*Lawrence E. Finegan,* with whom were *Stern, Finegan & Winik, P.A.* on the brief, for appellees.

LOWE, J., delivered the opinion of the Court.

This appeal from the judgment of the Circuit Court for

Frederick County is before us for the second time. Appellants complain that although they won in that court, the amount recovered was insufficient. The suit was for a real estate commission and the issue to be decided was whether there was an agreement upon the amount of commission and, if so, what was that agreement.

At the trial on May 2, 1978, the Honorable Samuel W. Barrick held that the appellants failed to meet their burden of proof to show that there was an agreement to pay an 8% commission. The judge awarded a 4% commission to the appellants without adequate explanation for us to review for evidentiary sufficiency although appellants did appeal that decision to this Court on May 29, 1978. By per curiam opinion filed on March 7, 1979, we remanded the case to the Circuit Court for Frederick County for the trial judge to "enter on the record a clear statement of his factual findings and the basis, in law, for the judgment entered." The Honorable Samuel W. Barrick, by Memorandum dated March 28, 1979, found that while the appellants did not expressly agree to a 4% commission, they did in fact agree to that commission by Ganley's silence when there had arisen a duty to speak. The appellants have taken this appeal from that decision.[1]

Because the primary question asked on appeal is predicated upon factual findings, we will reproduce the court's opinion in the pertinent part which contains significant findings of fact. Doing so serves the added purpose of setting the factual background in some perspective.

### *"MEMORANDUM*

Paul B. Ganley (Ganley) and David W. Kornblatt Associates, Inc. plaintiffs, brought this suit against G & W Limited Partnership, Martin R. Grunley (Grunley) and William V. Walsh (Walsh), Defendants, in a two-count declaration. The first count alleges breach of contract, and the second

---

1. It is apparent that David W. Kornblatt Associates, Inc. (Kornblatt) had no agreement with appellees. Because his claim against *them* is a derivative one, it stands or falls with Ganley's case.

count is based on quantum meruit, each count claiming compensatory damages in the amount of 10% commissions on a sale price of $217,800 ($21,780) plus punitive damages in the amount of $65,000. The court awarded damages to the Plaintiff in the amount of $8,712 (4% commissions) plus interest from date of settlement which was held on June 22, 1977, and costs of suit. The Plaintiffs appealed that decision, and the Court of Special Appeals has remanded the case without affirming or reversing with directions that the trial judge enter on the record a clear statement of his factual findings and the basis, in law, for the judgment entered.

Ganley and the defendants had several business transactions concerning the sale of real estate prior to this sale. In each of the previous cases the commissions had been negotiated. Ganley's testimony as to commissions due in this sale is somewhat confusing. On page 14 of the record he was asked, 'When did you have a discussion with Mr. Grunley and Mr. Walsh with respect to commissions to be paid with regard to the sale of ten acres of property to Thomas Foods?' He answered '— Mention of a commission had never come up until our meeting on April 14th when a price was agreed upon per acre'. At the bottom of page 21 and at page 22 Ganley indicated that he talked with Mr. Grunley or Mr. Walsh, or both of them, a week prior to the April 14th meeting concerning commission for the sale of the subject property, at which time he stated that he would accept 8% commission, but there was no response concerning that amount by either or both of them. When examined on cross-examination as to his recollection of telling Mr. Walsh at the meeting prior to April 14th of the 8% commission, he seemed somewhat unsure. There is, however, undisputed testimony that a listing agreement setting forth the commission was never signed by the Defendants or either of them. Furthermore, there was testimony by

Walsh that the Commissions due Ganley on all transactions between the parties were negotiated after Ganley found a buyer in relation to the purchase price. The court made a finding of fact that this was their method of operation, commissions were negotiable.

The court further finds as a matter of fact that the parties Ganley, Walsh and Grunley did enter into a discussion at a meeting of April 14th and did agree in accordance with the testimony of Walsh and Grunley that the property should be sold at the reduced price of fifty cents per square foot and that Ganley should accept a commission of 4% because the owners were reducing the selling price. To support this finding, it would seem, as testified to, that it would be to the advantage of all parties to get the first sale on this property; and the fact that Thomas would put in certain improvements which would benefit all concerned.

The court further finds that although Ganley did not in words agree to the 4% commission, he did in fact agree to that commission by his silence. As a general rule, mere silence will not raise an estoppel. However, under the circumstances which require a silent party to speak so that the injured party may take steps to protect himself against loss which might otherwise result, the silent party will be estopped from asserting the defense which he would have had but for his silence. *Laurel Race Course v. Regal Construction,* 274 Md. 142, 156. *Wilson on Contracts* recognizes this principle. See Sec. 91. At the conference of Ganley, Walsh and Grunley during the meeting of April 24th, Ganley in effect accepted a 4% commission while Grunley and Walsh accepted a reduced selling price. Although Ganley did not accept the 4% commission in words, he did by his silence."

The primary question asked by appellants is whether the trial court erred

"in finding that there had been an acceptance by silence of Appellees' offer to accept a 4% real estate commission since there was no legally sufficient evidence to support this finding or to apply this principle of law."

Because we find that the evidence was legally sufficient, we do not reach the alternate question asked.

Appellants concede that silence can serve as an acceptance when the circumstances impose a duty to speak. And well they might so concede since the Court of Appeals has said:

"As a general rule, mere silence will not raise an estoppel, *Savonis v. Burke,* 241 Md. 316, 320, 216 A. 2d 521 (1966); *Mohr v. Universal C.I.T. Corp.,* 216 Md. 197, 205, 140 A. 2d 49 (1958). Where, however, the circumstances are such as to require a silent party to speak, so that an injured party may take steps to protect himself against a loss which might otherwise result, the silent party will be estopped from asserting the defense he would have had but for his silence, *Mohr v. Universal C.I.T. Corp., supra; Union Trust Co. v. Soble,* 192 Md. 427, 64 A. 2d 744 (1949); *First Nat. Bank v. Wolfe,* 140 Md. 479, 117 A. 898 (1922); *see Furst v. Carrico,* 167 Md. 465, 468, 175 A. 442 (1934).

This principle has been approved by the commentators and text writers. *See, e.g.,* 1 Williston on Contracts, § 91 (3rd Edition 1957); 1 Corbin on Contracts, § 75 (1963); Restatement of Contracts 2d, § 72 (1973). These authorities recognize, as one of the limited exceptions to the general rule that silence does not operate as an acceptance of an offer, this proposition: Where the offeree with reasonable opportunity to reject offered services takes the benefit of them under circumstances which would indicate to a reasonable person that they were offered with the expectation of compensation, he

assents to the terms proposed and thus accepts the offer." *Laurel Race Course v. Regal Constr.,* 274 Md. 142, 156 (1975).

The principle is as indicated one of equitable estoppel, the essence of which was synopsized by Judge Orth for the Court of Appeals in *Impala Platinum v. Impala Sales,* 283 Md. 296, 322-323 (1978):

> "The Court has upheld and consistently applied the definition of equitable estoppel contained in 3 J. Pomeroy, Equity Jurisprudence § 804 at 189 (5th ed. 1941):
>
>> 'Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy.'
>
> *See Dahl v. Brunswick Corp.,* 277 Md. 471, 487, 356 A.2d 221 (1976); *Savonis v. Burke,* 241 Md. 316, 319, 216 A.2d 521 (1966) and cases therein cited. 'Estoppel is cognizable at common law either as a defense to a cause of action, or to avoid a defense. . . .' *Bitting v. Home Ins. Co.,* 161 Md. 56, 60, 155 A. 329 (1931) and cases therein cited. There may be an estoppel to prevent a party from relying upon a right of property or contract, or of remedy both at law or in equity. *Kline v. Lightman,* 243 Md. 460, 474, 221 A. 2d 675 (1966). *See Machovec v. Shipley,* 171 Md. 339, 344, 189 A. 223 (1937). 'Equitable estoppel operates as a technical rule of law to prevent a party from asserting his rights where it would be inequitable and unconscionable to assert those rights. . . . It is essential for the application of the doctrine of

equitable estoppel that the party claiming the benefit of the estoppel must have been misled to his injury and changed his position for the worse, having believed and relied on the representations of the party sought to be estopped.' *Savonis,* 241 Md. at 319-320 and cases therein cited. Mere silence will generally not raise an estoppel against a silent party. *See Mohr v. Universal C.I.T. Corp.,* 216 Md. 197, 205, 140 A.2d 49 (1958) and cases therein cited. '[T]he doctrine is only applicable when there is a duty imposed upon the party remaining silent to speak....' *Mason v. Dulaney,* 144 Md. 108, 114, 124 A. 390 (1923). Whether an estoppel exists is a question of fact to be determined in each case. *Addressograph-Multigraph v. Zink,* 273 Md. 277, 282, 329 A.2d 28 (1974); *Bean v. Steuart Petroleum,* 244 Md. 459, 469, 224 A.2d 295 (1966); *Travelers v. Nationwide,* 244 Md. 401, 414, 224 A.2d 285 (1966)."

Fleshing out the facts here from the record, we find that Ganley, a real estate broker, stood in a fiduciary capacity towards G & W Limited Partnership (G & W), his principal. This relationship required Ganley to act in good faith and to disclose to his principal all facts which were or may have been material to a transaction which would affect the principal's interest and influence his conduct. *Sellner v. Moore,* 251 Md. 391 (1968). Ganley had contracted with G & W, appellees, to procure a buyer for a parcel of real property located in Frederick County. After unsuccessfully attempting to sell the property during a period of time in which three written contracts had expired, Ganley procured a prospective buyer for a part of the property. Prior to this Ganley had entered into a co-brokering agreement with appellant Kornblatt; however, G & W had no knowledge of the contents of this agreement, nor did they have a written agreement with either appellant at the time Ganley procured the buyer. Ganley had at one point before procuring a buyer submitted an agreement to G & W, but that was not signed by appellees. The record indicates, as does the trial court's opinion, that the parties had had a previous working relationship or "method

of operation" whereby commissions were negotiated in relation to the purchase price after Ganley found a buyer. As stated in the opinion,

"[t]he court made a finding of fact that this was their method of operation, commissions were negotiable."

Such was the understanding of appellees in the transaction under review. Mr. Grunley stated that he

"understood it as an open listing, with a commission to be determined in relation to price."

Since their "method of operation" involved negotiation of commissions in relation to the buyer's offer, it was reasonable for appellees to expect that procedure to continue in the absence of a written contract.

At a meeting with the prospective buyer, an offer was made to appellees for only a portion of the property. The offer per square foot was half of the asking price. Deliberations were considered at a caucus apart from the prospective buyer, and Ganley counseled acceptance. Mr. Walsh recalled that Ganley

"agreed that it would be a good idea to get a big tenant in the site and get a building started, to get Frederick County to install utilities, sewer and water, so they would be connected to the sewage plant and we could square off then.

Q I'm talking about this side meeting.

A This is when it happened, that's when I'm talking about."

He further recalled that:

"At the meeting we talked to him and said, 'Look, we think it's to the benefit of everybody to try to get something built on the property; we're willing to cut ... what we're trying to get for the property; you should cut your commission,'

. . .

Q And you stated that Mr. Grunley said [to

Ganley], 'If you'll accept four percent we'll accept fifty cents per square foot,' is that right?
　A　Yes, sir."

Appellees became aware than Ganley was "co-brokering", but they didn't "know what kind of agreement they had". Apparently, the only response to the offer to accept the sale upon conditions of a commensurately reduced commission by Ganley was a single comment followed by silence.

"He [Ganley] pulled out Kornblatt's card and showed it to me [Grunley]. That was about the first time I knew there was a co-broker involved, and he said, 'I have a problem here.'
　Q　Did he say what the problem was?
　A　No.
　Q　Did he say anything else about the commission?
　A　Nothing. When we left the room I assumed that we had an agreement as to four percent, after caucusing."

We can agree with the trial judge that appellees' reliance on Ganley's silence was not unreasonable. When Grunley and Walsh offered four percent as commission fees, a permissible inference arose that Ganley had a duty to reject affirmatively the offer if he wanted to further negotiate his commission, or if the proposal was not acceptable. Evidence indicates that he knew that the circumstances required appellees to act expeditiously and that their decision was conditioned upon his acceptance; that Ganley knew that the buyer's half price offer was a take it or leave it proposal. These peculiar circumstances present at the time of the "caucus" interrupting the sale negotiations were such as to impose upon Ganley a duty to reject the offer affirmatively if it was unsatisfactory to avert his clients' expressed intention to act upon the condition proposed. As indicated in *Laurel, supra,* the offeree with reasonable opportunity to reject the compromised condition may not silently watch his principal move to his detriment and later benefit from his silence.

In an early application of the doctrine, the Court of Appeals explained it thus:

> "It has been very justly and forcibly observed that there is a negative fraud in imposing a false apprehension on another by silence where silence is treacherously oppressive. In equity, therefore, 'Where a man has been silent when in conscience he ought to have spoken, he shall be debarred from speaking when conscience requires him to be silent.' *Harris v. Am. Bldg., &c., Ass.,* 122 Ala. 545. Silence is a species of conduct and constitutes an implied representation of the existence of the state of facts in question, and the estoppel is accordingly a species of estoppel by misrepresentation. 16 *Cyc.* 681, note 10. When the silence is of such a character and under such circumstances that it would become a fraud upon the other party to permit the party who has kept silent to deny what his silence has induced the other to believe and act upon it, it will operate as an estoppel. 16 *Cyc.,* 756. Where a person with actual or constructive knowledge of the facts induces another by his words or conduct to believe that he acquiesces in or ratifies a transaction, or that he will offer no opposition thereto, and that other, in reliance on such belief, alters his position, such person is estopped from repudiating the transaction to the other's prejudice. *Id.* 791, and cases in note 87. Even when the statute of fraud has been relied on, the equitable doctrine of estoppel has been enforced to prevent fraud. *Goldman v. Brinton,* 90 Md. 359." *Carmine v. Bowen,* 104 Md. 198, 203-204 (1906).

The "treacherously oppressive" silence in that case arose when a landlord notified a farm tenant that his lease would not be renewed but ordered him to "sow grass seed" prior to the termination date. When the tenant declined, the landlord wrote saying:

> " 'I understand that you are making preparations for sowing your fall crop which will not mature until

after the expiration of your lease of the farm. * * * I understand also that it is not your intention to sow any grass seed. I do not admit that in any event you will have the right to remove ·any crops after the expiration of your lease, and will stand on my rights in this matter, whatever they may be. But I particularly warn you, that I will hold you strictly to the consequences of your failure to sow grass seed, and if it should prove that the failure on your part to sow grass seed will defeat your right (if you otherwise have it, and which I do not admit, as I have above stated) to remove the outgrowing crops after the term, you will have yourself to blame for it.' " *Id.* at 200.

Several months later, after the lease had expired, the landlord again wrote to the tenant. The Court explained what transpired thus:

"In the latter part of May, nineteen hundred and four, the appellant sent another letter warning the appellee not to undertake to cut or take away any of the crops then on the farm 'or which shall hereafter mature thereon.' Prior to the date of this last letter the term of the appellee as tenant had expired and he had in obedience to the notice given him and pursuant to the stipulations of the lease, vacated the farm on March the first. The appellee sowed in the fall of nineteen hundred and three — that is, in the fall preceding the expiration of his tenancy on March the first, 1904 — about fifty acres of wheat and twenty acres of rye, which matured and ripened after the end of his term. It further appears from the bill, the answer and the testimony, and it is therefore undisputed, that after about six acres of wheat had been sowed in the fall of 1903 the appellant went to the field and inspected the work and inquired how much timothy was being sowed, and when told by the appellee that the quantity was a strong peck to the acre, expressed himself as

satisfied. At the same time the appellee said to the appellant, 'I don't anticipate any trouble in the cutting of my crop,' to which the appellant made no reply." *Id.* at 200.

Such was the "treacherously oppressive" silence which the Court of Appeals held sufficient in a court of equity to estop the landlord from claiming the crops growing upon his land despite the law being to the contrary at the time. While that case seems somewhat strained to reach its result, it clearly indicates the extent to which the silence principle of equitable estoppel will impose a duty to speak.

The evidence in this case was such that a factfinder could more readily conclude that Ganley knew that the sale was conditioned upon Ganley accepting a reduction in his commission; the sale was ultimately agreed to, and Ganley had a duty to reject the 4% commission fee so that G & W could further evaluate its position. The relationship of the parties, their previous dealings, and the exigent circumstances were such as to impose a duty to speak. See 17 C.J.S. *Contracts* § 41.

*Judgment affirmed.*
*Costs to be paid by the appellants.*