MANN AND OSBORNE T/A HARFORD SOD COMPANY
v. PHILIP VIZZINI & SON, INC.

[No. 65, September Term, 1971.]

*Decided November 15, 1971.*

The cause was argued before HAMMOND, C. J., and
BARNES, FINAN, SINGLEY, and DIGGES, JJ.

*John H. Garmer* for appellants.

*W. Hamilton Whiteford* for appellee.

BARNES, J., delivered the opinion of the Court.

The questions presented to us in this case are whether
the Superior Court of Baltimore City (Cardin, J.) erred
(1) in finding that the appellants, Earl R. Mann and

Winton B. Osborne, trading as Harford Sod Company (Harford Sod), did not establish that the rejection of a portion of the work of Harford Sod as subcontractor under a contract dated September 6, 1961, with the appellee, Philip Vizzini & Son, Inc. (Vizzini or general contractor), by the Mayor and City Council of Baltimore (the City or owner) was unreasonable, arbitrary or capricious and (2) the closely related question, whether that court erred in not finding that the decision of the Building Construction Engineer of the City that the work was not satisfactorily performed, was the result of fraud or bad faith.

The subcontract of September 6, 1961, was to perform for $28,000 certain landscaping work at the Rock Glen School which was being constructed by Vizzini under a prime contract with the City, dated July 31, 1961. In Paragraph 2 of the subcontract it was provided in relevant part:

> "The terms of the prime contract between the Contractor and Owner inclusive of general conditions, special conditions and other contract documents shall form a portion of this contract insofar as applicable to the work of the Subcontractor, and the Subcontractor shall be bound to Contractor relative to the work of the Subcontractor to the same extent to which the Contractor is bound to the Owner."

The portion of the work in the prime contract to be performed by the subcontractor, Harford Sod, was Division 49 entitled "LANDSCAPING." The specifications for Division 49 provide, *inter alia,* that:

> "(a) The Contractor shall furnish all labor, equipment, materials and services necessary for and reasonably incidental to the execution and completion of all landscape work, as shown on the drawings and/or specified.
> "(b) Work under this Division shall include,

but is not limited to, the following: fine grading, preparation of all top soil surfaces for seeding and sodding, liming, fertilizing, seeding, sodding and erosion control.

"(c) All unpaved areas of the school grounds not sodded shall be seeded. See drawings for the extent of sodding."

\* \* \*

"2. APPROVALS BY THE ENGINEER:

"(a) Selection of all materials and execution of all operations shall be subject to the specific approval of the Engineer.

"(b) The Engineer shall have the right to reject at any stage of the work any and all materials and/or methods of work which in his opinion do not meet the standard required by the specifications. Any rejected materials shall be immediately removed from the site."

The materials to be used are then described in detail. The Contractor was to furnish all water, hoses, water tanks and other equipment for the landscaping operations. The seeding seasons and conditions are set forth. It was provided that the seasons may be extended because of weather conditions "if permission is obtained in writing from the Engineer."

Specific provisions are set forth in regard to excavating, rough grading, seeding and sodding. Paragraph 7, entitled "CONTRACTOR'S RESPONSIBILITY," provides:

"The Contractor shall be responsible for all graded areas, including banks and slopes and he shall replace any and all washouts at his own expense. This requirement shall terminate when the work has been fully accepted and acceptance shall be contingent on a well established dense growing lawn being obtained."

Paragraph 8, entitled "MAINTENANCE," provides, in part, as follows:

"(a) Maintenance for any given area shall immediately follow the seeding or sodding of that area or the mulching of the stream banks *and shall continue until the work has been accepted by the City.*

"(b) Lawn areas, seeded or sodded shall be properly cared for *to the satisfaction of the Engineer.* This work shall include watering, weeding, mowing, rolling, trimming and edging and any other necessary operation of maintenance."

\* \* \*

"(c) Any water retaining hollows that may develop shall be corrected by the Contractor at his own expense *to the satisfaction of the Engineer.*"

(Emphasis supplied.)

Paragraph 10, entitled "GUARANTEE," provides:

"(a) The Contractor's attention is directed to the guarantee obligations contained in the paragraph entitled 'Guarantee' in the 'GENERAL CONDITIONS' of these specifications.

"(b) In addition to the guarantee obligations referred to in paragraph (a) above, *the Contractor shall produce a dense well established lawn over the entire site, regardless of whether the area is seeded or sodded and he shall reseed and replace sod as often as it is necessary to accomplish this.*"

(Emphasis supplied.)

In the General Conditions of the prime contract, paragraph 9, entitled "SUPERVISION BY THE BUILDING CONSTRUCTION ENGINEER," states, in part:

"The work is to be carried out under the supervision of the Building Construction Engineer and to his entire satisfaction, subject to the powers of the Director of Public Works.

The work and material shall be strictly of the best quality of the kind herein specified, and should any work or materials other than those specified or shown be introduced into the construction of the work, the Building Construction Engineer, or his authorized agent, shall have full power to reject them and they shall be removed from the premises within twenty-four (24) hours by the Contractor after being notified to do so."

The "AUTHORITY OF BUILDING CONSTRUCTION ENGINEER AND DIRECTOR OF PUBLIC WORKS" is set forth in paragraph 10, in part, as follows:

"(a) Subject to the power and authority of the Director of Public Works as provided by law and in these contract documents, the *Building Construction Engineer shall in all cases, determine the amount or quantity, quality and acceptability of the work* and materials which are to be paid for under this contract; shall decide all questions in relation to said work and the performance thereof, and shall in all cases decide questions which may arise relative to the fulfillment of the contract or to the obligations of the Contractor thereunder."
(Emphasis supplied.)

Subparagraph (b) designates the Director of Public Works as referee between the prime contractor and the City and his decision is made final and conclusive and a condition precedent to the right of the prime contractor to receive any moneys under the prime contract.

By paragraph 66 of the General Conditions, the prime contractor guarantees all the work shown on the drawings and specifications for two years from the date of final acceptance of the completed project by the City against all faulty or imperfect materials and against all imperfect or careless or unskilled workmanship.

Harford Sod was notified by Vizzini to begin work under the subcontract in April, 1963. Before sod could be laid at the site, it was necessary for the subcontractor to get approval from two inspectors assigned to the job —one from the Bureau of Building Construction and the other from the Board of Education of Baltimore City. Mr. Osborne, one of the then partners, testified for Harford Sod that these inspectors were shown several sod fields in April and May, 1963, but could not obtain their approval for the sod proposed to be used. The inspectors "kept insisting that possibly we look at sod at Gaithersburg, Maryland," but this was 60 or 70 miles from Harford County. After removing certain sod because there had been no prior written approval for it, Harford in June or July obtained sod, approved orally, at land near Rutland, Maryland; and this was used to perform the job, with some sod from the Curtis King property at Churchville. Mr. Osborne stated that the job, except for maintenance, was completed in August, 1963. Vizzini, by a letter of November 21, 1963, notified Harford Sod that certain areas need "finishing up" so that Vizzini could call for an inspection. Mr. Osborne testified that the unfinished areas could not be finished prior to November because of the incomplete work of other subcontractors. He further stated that these areas were completed and the job was ready for inspection in November, 1963. At least three inspections were conducted in the last part of 1963 and in each instance different unsatisfactory areas were designated to be fixed before approval could be given. Mr. Osborne testified that he never refused to do anything the inspectors asked him to do to make the job acceptable to the City.

Mr. Osborne also testified that:

"We took out sod and put in sod and mowed and swept the sidewalks and sprayed it with chemicals and put in seed and fertilizer and mowed it again. And this continued on for a year. But in May of 1964, I finally got the im-

pression that this job was not going to be accepted at all under any conditions, because to put it bluntly, we hadn't put the money in the City inspectors' pockets, I guess. So I was talking to Mr. Mann about pulling off the job and letting it go."

The partnership of Mr. Osborne and Mr. Mann was dissolved in January, 1964. Mr. Osborne continued in business under the name of Harford Sod. By the dissolution agreement, Mr. Mann was to be responsible to "finish up" the Rock Glen School job. Mr. Osborne, however, visited the site in May and mid-summer, 1964, and stated that the job was acceptable in May. He was supported in this opinion by George S. Wolbert, a landscaping contractor for some 37 years, who testified that in his expert opinion the job was in an acceptable condition when he inspected the site in May, 1964.

Mr. Mann testified in regard to his activities on the job. Relevant excerpts from his daily work diary as well as those of two of his employees, Tyria Yale and Claude Crouse,—all kept in the regular course of business — were introduced into evidence. These excerpts indicate that from April 2, 1964, through July 11, 1964, and then on two occasions in October, 1964 (by Mr. Mann alone), seeding, sodding, watering, fertilizing, repairing and mowing were done by Mr. Mann and the employees at the Rock Glen School site.

On May 12, 1964, Vizzini wrote Harford Sod a registered letter, with a return receipt requested, stating that it was "your final notice to proceed and correct the entire area of seeding and sodding" for the Rock Glen School job. The letter further stated that one of the inspectors had pointed out "the deplorable situation that now exists due to the not properly maintaining of sod at the proper time." The proposed solution was:

"1. To mow the entire job within 48 hours from the time you receive this notice, and rake the field after it is mowed.

"2. Immediately proceed with the spraying of the material suitable to kill weeds.

"3. Soon after that, to seed it and keep it wet."

It was further stated that if Harford Sod did not carry out the solution Vizzini would be "forced to let the Bureau of Building Construction proceed in correcting this situation and whatever amount is spent by them will be deducted from the balance of money due you."

Mr. Mann testified that all of the recommended things were done.

Counsel for Harford Sod wrote Vizzini on September 15, 1964, asking the prime contractor to tell the subcontractor "exactly what must be done to accomplish an acceptance of this job."

Vizzini wrote to the Building Construction Engineer of the City, summarizing the condition of the work at the Rock Glen School job and indicating that Harford Sod contended that the job "was in an acceptable condition in general on more than one occasion. . . ." Vizzini had gone over the job with R. W. George in accordance with the City's letter of July 21 and ascertained from Mr. George what he thought should be done.

Counsel for Vizzini wrote counsel for Harford Sod on September 23, 1964, stating that the City had two bids to finish the job predicated on attached specifications for $5,900 and $5,725. It was also stated that the Building Construction Engineer was reluctant to have Harford Sod do the work but finally had indicated that Harford Sod could do the work "provided *they* and not the City specify what they will do." The letter continued:

"If you care to have them prepare such specification, please let me have it and we will send it through in Mr. Vizzini's name. The requirements for new bidders as attached will probably be your guide."

Seven specifications were attached, as follows:

> "Mow entrance area
> Rake area where there are weeds and grass
> Apply liquid weed killer, using second application where necessary
> After one week fertilize entire area with 10-6-4
> Rake area—where needed, reseed using mixture as specified in book
> Cut grass; three cuttings or to end of this year's growing season
> Outside of fence (slopes) fill in area with top soil, fertilize and seed top area, using weed killer first."

On behalf of Vizzini, William P. Schnabel, an architect employed by the City for 49 years, who had Rock Glen under his supervision, testified in regard to the Harford Sod performance under the subcontract. He described the various inspections made and exhibited to the trial court several photographs showing tall weeds and other details. All of the inspections resulted in a finding of generally unacceptable and incomplete work by Harford Sod. After these inspections, Mr. Schnabel would write to Vizzini in regard to his findings and the need for corrective work in order to comply with the prime contract. Vizzini would then pass this information on to Harford Sod. Mr. Schnabel had received a letter from the Department of Education that the neighbors were complaining about the condition of the landscaping at the Rock Glen School. He found the weeds were knee-high. He stated that repairs "now would be much more costly as a lack of maintenance has further deteriorated the work; * * *." The City's procedure in the present case was no different from other cases of this nature. Finally, the work not having been satisfactorily done, the City solicited other bids, receiving one for $5,724.40 in September, 1964, and the other (and lower) from Mr. George for $5,630.00 on October 7, 1964. The contract to

complete the work was given to Mr. George and the amount of $5,630.00 was deducted from the amount of the prime contract consideration by the City. Vizzini thereafter sent a check to Harford Sod for $4,215.86 as the balance due under the subcontract less the charge back of the $5,630.00. The check contained a form for release by endorsement so that Harford Sod declined to present it for payment and sued for the amount of the check plus the sum of the charge back.

The trial judge in his opinion found that the City had not unreasonably, arbitrarily or capriciously withheld approval of the job and, indeed, that from the testimony offered on behalf of Harford Sod, indicated that the work had not been completely done. He found no fraud or bad faith on the part of the Building Construction Engineer in deciding that the work was not satisfactorily completed in accordance with the contract. He then entered a judgment for the defendant, Vizzini, for costs. Harford Sod took a timely appeal from that judgment.

Inasmuch as this case was tried by the lower court without a jury, its findings of fact will not be disturbed by us unless clearly erroneous. Maryland Rule 886. The trial court found from the evidence that the work was never completed in accordance with the contract and that the City's procedure in the present case was no different from that in similar cases obviously accepting the testimony of Mr. Schnabel to that effect. There was other evidence supporting these findings. We do not find these findings to be clearly erroneous.

### (1)

There was evidence — some of it uncontradicted — that the inspectors on the job were far from helpful in either approving the sod proposed to be used or in indicating, with specificity, their objections to the work done by Harford Sod from time to time. We do not wish to be thought to approve this type of conduct; but, upon all of the testimony, we cannot say that this, in itself, amounts to such unreasonable, arbitrary or capricious

conduct as would *require* a finding that acceptance had been arbitrarily, unreasonably and capriciously withheld by the City, particularly in the light of the Schnabel testimony and the provisions of the contract documents.

### (2)

In order for the subcontractor, Harford Sod, to recover, it must prove that the decision of the Building Construction Engineer that the work had not been satisfactorily performed under the contract was the result of fraud or bad faith. *Charles Burton Builders v. L & S Const. Co.,* 260 Md. 66, 84, 271 A. 2d 534, 543 (1970) and cases therein cited. Taking the testimony as a whole, the decision of the trial court that there was no fraud or bad faith on the part of the Building Construction Engineer in making the determination was not clearly in error.

*Judgment affirmed, the appellants to pay the costs.*