## LAUREL RACE COURSE, INC. *v.* REGAL CONSTRUCTION COMPANY, INC.

[No. 134, September Term, 1974.]

*Decided March 6, 1975.*

*Motion for rehearing filed April 4, 1975; denied April 7, 1975.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Robert E. Sharkey* and *Donald N. Rothman*, with whom were *Gordon, Feinblatt, Rothman, Hoffberger & Hollander* on the brief, for appellant.

*Thomas A. Farrington*, with whom were *Sasscer, Clagett, Channing & Bucher* on the brief, for appellee.

LEVINE, J., delivered the opinion of the Court.

The dispute which has resulted in this appeal was spawned from the lofty but earnest ambition of appellant, Laurel Race Course, Inc. (Laurel), to build "the best [race] track in the United States." To the extent that it might not have fully attained such preeminence, it undoubtedly faults appellee, Regal Construction Company, Inc. (Regal), with whom it had contracted to rebuild its track. Its dissatisfaction with the quality of Regal's performance under that contract led to Laurel's refusal to pay a portion of the sum claimed for those services. As a consequence, Regal brought suit and, following a nonjury trial in the Circuit Court for Prince George's County (Bowen, J.), obtained a judgment against Laurel in the amount of $67,276.17. This appeal followed.

As the first step in its quest, Laurel, in March 1972, engaged an internationally renowned engineering firm, Watkins and Associates, Inc. (Watkins) of Lexington, Kentucky. Later that spring, Laurel and Watkins entered into a contract whereby the latter agreed to design a plan for the reconstruction of the Laurel track and the installation of a complete drainage system. Watkins had achieved success in designing such "all-weather" tracks for a number of

racing courses throughout the world. In addition to preparing a design, a set of specifications and other similar documents, Watkins was to have personnel in attendance during the construction phase.

In June 1972, Regal submitted a bid proposal for the construction work. In doing so, it agreed to perform "in strict accordance with the terms and conditions of the specifications and contract documents . . . and the plans . . . and do such other work incidental thereto as [might] be ordered by the Engineer, at the unit or lump sum prices quoted in the attached 'Bid Schedule.' " It also declared that it had "examined the site of the work and informed [it]self fully in regard to all conditions pertaining to the place where the work [was] to be done; [and] that [it had] examined the plans, specifications, and contract documents . . . ." It also agreed to "substantially complete all work on or before September 1, 1972, and to finish the job by September 15, 1972." This document and the contract itself expressly made time of the essence.

After becoming the successful bidder, Regal executed the usual panoply of documents which regularly attend such transactions. Among them was the "General Conditions" which defined Watkins's status as the "Engineer." It was to "have general inspection and direction of the work as the authorized representative of the owner [Laurel]." It had "authority to reject work and materials which [did] not conform to the plans, specifications and contract documents, . . . [and to] decide all engineering questions . . . ." It was also charged with the duty to "interpret the meaning and requirements" of those documents and to "decide all disputes" that might arise thereunder.

In order to "protect itself from loss," Laurel was permitted to withhold partial payments from Regal if the latter failed "to remedy defective work" and for "other causes which in the opinion of the Engineer would justify [Laurel] in withholding such . . . payments." In addition, the General Conditions allowed Laurel to "retain not less than [ten percent] of the amount [of each partial payment] until final completion and acceptance of all work covered by this

contract." The General Conditions concluded with a guarantee by Regal of "all construction against defective materials, equipment and workmanship for a period of twelve months . . . ." This included a commitment to "replace such defective parts without cost to the Owner."

Essentially, the work to be performed by Regal consisted of the rehabilitation of both the dirt and turf tracks, and the installation of a surface and underground drainage system, including proposed lakes, most of which was designed primarily to provide a "faster" track under "all-weather" conditions. The specifications detailed rather minutely the gradation requirements for the various materials to be used in the base, subbase and cushion of the main track. In this connection, the specifications provided: "If any over-size rock, or other deleterious materials that could be harmful to a running horse, are incorporated within the base material during the storage, mixing, or hauling of the base soil, such harmful material shall be removed by the Contractor at his own expense." With respect to the storm drainage system, the specifications provide that "[a]ll pipes shall be laid with ends abutting and true to line and grade," and that the "space between pipes shall be filled with a concrete mortar of proper consistency" as therein specified.

Both the subbase and blended base materials were to "be paid for at the contract unit price in-place and compacted to the required density." Payment under the entire contract was to be made on a "unit price" basis, whereby the total amount to be paid Regal was to be determined by applying the unit prices contained in the bid proposal to the actual quantities "certified by the Engineer for the items enumerated in the Bid Schedule . . . ."

The contract was dated July 3, 1972, and Regal apparently commenced its work shortly thereafter. Performance was neither substantially completed by September 1 nor fully completed by September 15. Regal professes to have substantially completed the work in accordance with the contract terms by September 25, and claims that it ultimately rendered complete performance. On September 28, 1972, after "turning over" the track to Laurel on the 25th,

Regal received a "punch list" of 18 items requiring its attention. After Regal claimed in late November that it had remedied those deficiencies and therefore demanded payment in full, Watkins forwarded its recommendation that payment be withheld because:

"During the construction of the base the Contractor permitted a large amount of rock and oversize material to become mixed with the clay and sand which were hauled from the source of supply and, in spite of repeated requests, did not make a reasonable effort to remove this material from the base while it was being placed. . . . [I]t has been necessary for [Laurel's] crew to perform a large amount of maintenance work that would not have been required had the base been properly blended and compacted.

"The condition of the track for the first three weeks resulted in justifiable complaints from the horsemen and could be traced directly to the failure of the Contractor to obtain adequate compaction and proper shaping of the inside ditch and drainage."

Having received the recommendation from Watkins that payment of the balance due be retained, Laurel refused to pay the sum of $110,931.91, representing the amount then claimed by Regal as the unpaid balance on the total contract amount of $786,401.35. The latter brought suit for this amount plus interest in February 1973. By the time of the trial in April 1974, the amount claimed by Regal under the written contract had been reduced to $49,648 plus interest because Laurel had made additional payments during the intervening period.

In its declaration, Regal sought payment under two express contracts. For its first cause of action, it claimed the $49,648 under the original contract to which we have alluded. The other claim, amounting to $42,657.48, was based on a verbal contract allegedly entered into during late December 1972, when a conference was held between the

parties to resolve the impasse which had arisen. The essence of this claim is that Laurel agreed to pay Regal for such additional work as the latter would thereafter perform, provided it was not found to have been necessitated by defective or incomplete performance under the basic written contract. Regal claimed that it was entitled to recovery under this theory for additional work it subsequently had performed in the summer of 1973.

At the trial, Regal's witnesses claimed that the blended soil base material which it had supplied not only had met the contract specifications, but also had been approved by Watkins, whose personnel had been present throughout the construction stage. With respect to the 24-inch pipe which had been installed as part of the drainage system, Regal conceded that it had become separated in some places and was "out of alignment both horizontally and vertically," but insisted that originally it had been "laid true to grade." It recognized the likelihood, however, that the bed supporting the pipe had not been properly reinforced, and that not all the joints had been mortared.

In regard to the verbal contract, Laurel claimed at the trial that rather than an additional agreement, what had emerged from the December 1972 conference was a request by Regal for a further opportunity to comply with the specifications under the original contract. Laurel maintained that shortly after Regal "turned over" the track on September 25, 1972, stones were observed on the cushion of the track that had "worked up from the base." This was initially observed during the training season which had preceded the racing season. To assuage the horsemen, who were fearful of injuries to the horses and the jockies, Laurel found it necessary to perform a considerable amount of work with its own employees and equipment. Laurel sought to recoup the expenses incurred for this labor and equipment by backcharging Regal. This claim also included a charge for Laurel equipment that was used by Regal in an effort to bring the track into conformity with the specifications.

When Regal returned to the site in the summer of 1973, it did some additional work on the base of the track in the

form of "remixing and reblending." Expert soil engineers employed by Watkins testified that these efforts had improved the quality of the track, but had not brought it into compliance with the specifications because of stones and excessive clay content. They pointed out that any stone greater than $3/8$ of an inch was too large for a racetrack, and that such stones were "coming out of" the ten-inch soil base. The principal difficulty caused by the excessive clay content is that in rainy weather it expands and slows up the horses because it drains poorly. The witnesses acknowledged that they had observed the oversize stones in the material being installed by Regal in 1972, but were repeatedly assured by the latter's construction superintendent, who said " 'I'll get them out.' " There had been testimony that during the construction stage, Regal employees were "out with buckets, they were handpicking [the stones]."

The expert testimony on behalf of Laurel was that only the part of the 24-inch pipe which did not run under the track could be unearthed, but an inspection of that part indicated it had not been laid true to grade; that the joints were not closed tightly and had not been mortared; and the "lifting holes had not been plugged." Hence, the pipe had not been installed in accordance with the specifications and was not functioning correctly.

At the conclusion of the trial, the court said with respect to the stones, "I hold everybody accountable for that: the contractor, the racetrack owner and the engineers." Thus, it refused to recognize the presence of the stones as a deviation from contract performance. In regard to the refusal of the engineer to furnish the certificate, the court found that "[Regal] had performed substantially all that [it] was asked or instructed to do"; and that the track was "substantially in conformance with what was expected." Hence, it allowed the entire balance claimed under the written contract, $49,648. It also allowed $12,724.01 for the work which Regal had allegedly performed pursuant to the verbal contract. The court refused to allow Laurel any amount for the backcharges, although they were not controverted by any evidence. In addition to the total principal sum of $62,372.01,

the court allowed Regal interest in the amount of $4,904.16. A portion of this interest was on part of the judgment itself, and the remainder was on the sums which Laurel had paid during the period intervening between the filing of suit and the trial.

In urging reversal, Laurel advances these arguments:

(1) That the trial court erred in overruling Laurel's demurrer to count I of the declaration in which Regal had sought recovery upon the written contract. The demurrer was bottomed on the failure to allege production of the engineer's final certificate — a condition precedent to Laurel's liability.

(2) That the trial court, having found that Regal had only substantially performed its written contract, erred in nevertheless awarding judgment for the full contract balance.

(3) That the trial court erred in granting recovery under the alleged oral contract without having first found the existence of such a contract; in any event, there was no evidence which would have supported such a finding.

(4) That the court erred in allowing interest on the sums paid by Laurel prior to trial because, to that extent, the total recovery allowed exceeded the ad damnum clause of the declaration.

In the view we take of this case, it becomes unnecessary for us to decide whether the demurrer should have been sustained, since the grounds on which it was filed are, in any event, embraced within our disposition on the written contract.

(1)

Following the trial court's ruling on the demurrer, the case was tried on an amended declaration which included a claim under the written contract in count I and upon the oral contract in count II.[1] At the trial, Laurel persisted in its

---

1. The original declaration had been amended, pursuant to leave of court, for reasons unrelated to the demurrer.

contention, to no avail, that Regal failed to produce a certificate of the engineer as a condition precedent to liability under the written contract. As we have indicated, the same argument is pressed on appeal.

Almost a century ago, our predecessors held in *Gill v. Vogler*, 52 Md. 663, 666 (1879), where work was "to be done . . . to the satisfaction of the City Commissioner [of Baltimore]," and payments during the progress of the work were to be made only in accordance with his "monthly estimates," that those estimates were a condition precedent to recovery of such payments, absent bad faith or collusion.

From that holding has emerged the general rule, followed uniformly by decisions of this Court, that where payments under a contract are due only when the certificate of an architect or engineer is issued, production of the certificate becomes a condition precedent to liability of the owner for materials and labor in the absence of fraud or bad faith, *Chas. Burton Bldrs. v. L & S Constr.*, 260 Md. 66, 86, 271 A. 2d 534 (1970); *Pope v. King*, 108 Md. 37, 45-47, 69 A. 417 (1908); *Filston Farm Co. v. Henderson*, 106 Md. 335, 367, 67 A. 228 (1907); 3A Corbin on Contracts, § 650 (1960); *see Mann v. Philip Vizzini & Son, Inc.*, 263 Md. 471, 481, 283 A. 2d 577 (1971). Apart from fraud or bad faith, the only other exceptions to this rule are waiver or estoppel, *Chas. Burton Bldrs. v. L & S Constr.*, *supra*, 260 Md. at 86-87; *Filston Farm Co. v. Henderson*, *supra*, 106 Md. at 369.

The durability of this rule may be more readily appreciated when one considers the emphasis with which it was enunciated by our predecessors. For example, in *Lynn v. B. & O. R.R. Co.*, 60 Md. 404 (1883), Judge Miller said for this Court:

> ". . . So, in the case before us, it was not enough that the jury might believe from the evidence that Legge *unreasonably* rejected the ice, or that he was *grossly* wrong in his judgment . . . ; they must go further, and actually infer and find fraud or bad faith. By this contract, which is perfectly lawful, the parties expressly agreed to submit the question whether

the ice to be supplied was 'good, clear, and solid,' to the judgment of this third party, and his judgment, *no matter how erroneous or mistaken it may be, or how unreasonable it may appear to others, is conclusive* between the parties, unless it be tainted with fraud or bad faith. To substitute for it the opinions and judgments of other persons, whether judge, jury or witnesses, would be to annul the contract, and make another in its place." 60 Md. at 415 (emphasis added).

There is no question but that under subsection 24 of the General Conditions, payment of the "balance due ... including the percentage retained during the construction period" is expressly conditioned upon production of the engineer's " 'Final Certificate.' " [2] It is equally clear that the amount awarded by the trial court under count I of the declaration was the alleged "balance due ... including the percentage retained." Nor is there any contention advanced by Regal that any of the exceptions to the general rule — fraud, bad faith, waiver or estoppel — were established here.

The argument interposed by Regal to the applicability of the general rule rests exclusively on the second paragraph of subsection 2 of the General Conditions.[3] It

2. In pertinent part, subsection 24 provides:

"Upon notice that the work is ready for final inspection and acceptance, the Engineer shall make such inspection; and *when he finds the work acceptable* under the Contract and *the Contract fully performed,* he shall promptly issue a 'Final Certificate' over his signature stating in effect that the work provided for in the Contract has been satisfactorily completed and recommending its acceptance by the Owner.

"The balance due the Contractor, including the percentage retained during the construction period, *will then be paid* to the Contractor by the Owner. This final payment will be made within sixty days after date of the Engineer's 'Final Certificate', and said final payment shall evidence the Owner's acceptance of work unless it is accepted in writing prior to said final payment." *(emphasis added).*

3. Subsection 2, in its entirety, states:

"The Engineer shall have general inspection and direction of the work as the authorized representative of the Owner. He shall have

draws upon this language for the contention that the condition precedent in subsection 24 is dispensed with once "either party resorts to legal action." Otherwise stated, the argument is that the engineer's certificate is controlling — a condition precedent to payment — only until the parties reach the courthouse; but once they do so, the engineer's decision that the specifications have not been met is reviewable by a judge or jury. Thus, under this view, if the trier of fact were to determine that the specifications had been met, the absence of the engineer's certificate would not bar recovery by the contractor under the written contract.

Although Regal's argument purports to rest on the last several words of subsection 2, "either party resorts to legal action," it is necessarily keyed to the final phrase in the immediately preceding sentence of that paragraph, "and decide all disputes that arise." Under the construction advocated by Regal, this specific phrase alone not only refers to disputes under the first part of that sentence — concerning the engineer's interpretation — but applies to all disputes arising under the contract. Hence, Regal would say, the binding effect of the engineer's decisions on all disputes — whether arising out of interpretation or performance — is subject to the "legal action" clause. In sum, the engineer's decisions on all disputes of whatever nature, arising under the contract, would be binding only until there is a "legal action."

The difficulty we encounter with this argument is that it

---

authority to stop the work whenever such action may be necessary to insure the proper execution of the contract. He shall also have authority *to reject work and materials which do not conform* to the plans, specifications and contract documents, to direct the place or places where work shall be prosecuted, and to have the Contractor's force increased or decreased as in his judgment is required. *He shall decide all engineering questions* which arise in the *execution* of the work.

"The Engineer shall *also interpret* the meaning and requirements of the plans, specifications and contract documents, and *decide all disputes* that arise. The Engineer's decisions on *these* matters shall be final and binding on both the Contractor and the Owner unless both parties agree to submit the dispute to arbitration or either party resorts to *legal action* for settlement." (emphasis added).

completely ignores paragraph 1 of subsection 2 and the manifest intention of the parties. While this intent is readily discernible from the clear and unambiguous language of these provisions, we nevertheless think it appropriate to stress that the intention of the parties to an agreement must be garnered from the terms considered as a whole, and not from the clauses considered separately, *Delmarva Drill Co. v. Tuckahoe*, 268 Md. 417, 423, 302 A. 2d 37 (1973); *Kasten Constr. v. Rod Enterprises*, 268 Md. 318, 329, 301 A. 2d 12 (1973).

The engineer, pursuant to paragraph 1 of subsection 2, possesses the "authority to reject work and materials *which do not conform* to the plans, specifications and contract documents," and to *"decide* all engineering questions which arise in the *execution* of the work." (emphasis added). In accordance with this paragraph, decisions of the engineer on questions pertaining to performance and execution of the work are controlling and unqualified. Paragraph 2, however, is confined to disputes arising out of the engineer's role as an interpreter of the technical provisions contained in the various documents. The words "these matters," to which the "legal action" exception applies, pertain solely to such disputes. In this limited respect only are the engineer's decisions, though otherwise final, subject to the "legal action" exception.

At first blush, perhaps, one might question whether the positioning of the comma immediately preceding the words, "and decide all disputes that arise," was intended to mean that this phrase should refer to disputes under the first paragraph as well, and hence, whether the "legal action" exception should not apply to decisions under both paragraphs. This construction, however, would permit a simple comma to alter what we regard as the clear intent of the agreement. "The authorities make it plain that punctuation cannot control or alter the effect of language that is plain in its meaning." *Illian v. Northwestern Ins. Co.*, 215 Md. 507, 516, 138 A. 2d 884 (1958).

It is uncontroverted that the disputes under the written contract all relate to the rejection of "work and materials

which do not conform to the plans, specifications and contract documents . . ." within the contemplation of the first paragraph of subsection 2. Regal claimed at the trial that its performance did conform and Laurel insisted that it did not. Nowhere in the testimony is there a conflict over an interpretation of the "meaning and requirements of the plans, specifications and contract documents." Therefore, the "legal action" clause is not applicable.

As we see it, therefore, the supremacy of the engineer's certificate on all matters pertaining to conformance and execution survived the resort to "legal action," and should not have been ignored, absent a finding of bad faith, fraud, waiver or estoppel. No such finding was made here.[4] Hence, production of the engineer's certificate was a condition precedent to the liability of Laurel under count I of the declaration. It is fundamental that where a contractual duty is subject to a condition precedent, whether express or implied, there is no duty of performance and there can be no breach by nonperformance until the condition precedent is either performed or excused. *Shoreham v. Randolph Hills*, 248 Md. 267, 276, 235 A. 2d 735 (1967); *Barnes v. Euster*, 240 Md. 603, 606, 214 A. 2d 807 (1965); *Griffith v. Scheungrab*, 219 Md. 27, 34, 146 A. 2d 864 (1958); 6 Corbin on Contracts, § 1252 (1962); *see Metz v. Heflin*, 235 Md. 550, 552-53, 201 A. 2d 802 (1964). Here, the condition precedent was neither performed nor excused; therefore, no judgment should have been rendered against Laurel under the written contract.

This holding makes it unnecessary for us to reach the question whether the court erred in awarding judgment for the full contract balance despite its holding that Regal had rendered only substantial performance. Nor, of course, is it necessary that we address the failure of the court to allow credit for the uncontested backcharges. Hence, we pass to the question whether there was error in granting recovery under the alleged oral contract.

---

4. Clearly, the trial judge's finding that the engineer had become aware of the stones in the soil base material did not constitute a determination that Laurel was estopped from invoking the condition precedent; nor was it ever intended as such by the court.

(2)

The total amount claimed by Regal under the oral contract, $42,657.48, was grouped into four categories: $19,496.12 for "standby time" — which the court rejected — for the cost of keeping certain equipment at the track in 1973, while awaiting the opportunity to perform the additional blending; $1,771.04 for removing oversize stones, which the court allowed; $10,641.08 for the additional blending which the court also upheld; $10,749.24 for removing and replacing concrete pipe — of which the court allowed only $311.89; for a total of $12,724.01 awarded under the oral contract of December 1972 for work allegedly performed the following summer.

In challenging this award, Laurel launches a two-pronged attack. It argues that the court did not find that the oral contract was actually created; and that, in any event, there was insufficient evidence to support such a finding. It is important to observe that this claim is founded upon express contract and not upon quantum meruit. Thus, Regal could not recover by merely proving that it furnished labor and materials, but was required to establish the existence of an express contract, cf. *Weil v. Lambert*, 183 Md. 233, 241, 37 A. 2d 312 (1944). While the trial court might have been more explicit in finding that the parties entered into an express oral contract, we think, from reading its entire decision, that it did make such a finding.

The critical question is whether such a contract could properly be created in the manner disclosed by the testimony. Regal's president claims that when he met with the Laurel president in late December 1972 in an effort to compose their differences, he proposed to the latter that if the additional work, which Regal ultimately performed in 1973, was necessitated by defective workmanship on Regal's part, it would absorb the cost; but if it was occasioned for any other reason, Regal should be paid on a "cost-plus" basis. The witness concedes that this proposal was greeted with silence, but insists that this was taken by everyone present as Laurel's assent. Moreover, Regal immediately

ordered men and equipment onto the job; and though Laurel was manifestly aware that the work was in progress, it never rejected the proposal. Thus, Regal claims, Laurel is estopped to deny the existence of the oral contract because it accepted the benefits of Regal's performance.

The question presented here, therefore, is whether estoppel based upon silence is sufficient to constitute assent. As a general rule, mere silence will not raise an estoppel, *Savonis v. Burke*, 241 Md. 316, 320, 216 A. 2d 521 (1966); *Mohr v. Universal C.I.T. Corp.*, 216 Md. 197, 205, 140 A. 2d 49 (1958). Where, however, the circumstances are such as to require a silent party to speak, so that an injured party may take steps to protect himself against a loss which might otherwise result, the silent party will be estopped from asserting the defense he would have had but for his silence, *Mohr v. Universal C.I.T. Corp.*, *supra; Union Trust Co. v. Soble*, 192 Md. 427, 64 A. 2d 744 (1949); *First Nat. Bank v. Wolfe*, 140 Md. 479, 117 A. 898 (1922); *see Furst v. Carrico*, 167 Md. 465, 468, 175 A. 442 (1934).

This principle has been approved by the commentators and text writers. *See, e.g.*, 1 Williston on Contracts, § 91 (3rd Edition 1957); 1 Corbin on Contracts, § 75 (1963); Restatement of Contracts 2d, § 72 (1973). These authorities recognize, as one of the limited exceptions to the general rule that silence does not operate as an acceptance of an offer, this proposition: Where the offeree with reasonable opportunity to reject offered services takes the benefit of them under circumstances which would indicate to a reasonable person that they were offered with the expectation of compensation, he assents to the terms proposed and thus accepts the offer. This principle is clearly applicable here; therefore, an oral contract was created.

Little need be said regarding the trial court's findings relative to performance under this claim, since they were essentially factual determinations governed by Maryland Rule 886. Nor is there a fatal inconsistency between the court's finding that this work was not necessitated by deficient performance under the written contract and the engineer's good-faith refusal to issue its certificate, *see Lynn*

*v. B. & O. R.R. Co., supra.* In any event, since we are unable to say that the judgment of the trial court was clearly erroneous, we will not disturb the award under the oral contract in the amount of $12,724.01.

## (3)

With respect to the final contention advanced by Laurel, we do not agree that in awarding interest on the sums which were paid after suit was filed, the court exceeded the ad damnum clause. Regal orally reduced the amount of its claim, to allow credit for those payments, in open court immediately prior to the commencement of trial. The colloquy between the court and counsel clearly reflects that Regal retained its claim for the disputed interest. It appears that of the total interest awarded by the court, $4,904.16, the sum of $2,564.16 was attributed to those prior payments; and that the remainder pertained to a portion of the judgment awarded under the written contract, which, of course, must now be deducted from the judgment. Thus, the judgment herein must be reduced to $15,288.17 and, as so modified, affirmed.

> *Judgment modified as herein set forth; as so modified, affirmed; costs to be equally divided between the parties.*